CONTINENTAL EQUITIES, INC., Petitioner-Appellee Cross-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant Cross-Appellee.

No. 75–1562.

United States Court of Appeals, Fifth Circuit.

April 25, 1977.

* District Judge of the Northern District of Mississippi sitting by designation.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Appellate Section, Dept. of Justice, Tax Div., Meade Whitaker, Chief Counsel, I. R. S., Jonathan S. Cohen, David E. Carmack, Leonard J. Henzke, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., for Commissioner of Internal Revenue.

Robert A. Shupack, North Miami Beach, Fla., Eugene Short, Jr., Coral Gables, Fla., for Continental Equities, Inc.

Before JONES, COLEMAN and CLARK, Circuit Judges.

CLARK, Circuit Judge:

This appeal and cross-appeal are taken from a decision of the United States Tax Court. The Commissioner of Internal Revenue [Commissioner] challenges a ruling invalidating the assessment of an income tax deficiency against Continental Equities, Inc. [Continental]. The Commissioner contends that two net operating loss deductions taken by Continental should have been disallowed. Continental cross-appeals, urging that the Tax Court erred in upholding the Commissioner's decision to allocate to Continental interest income resulting from loans it made to four related corporations. In the alternative, Continental argues that if the allocation was proper, then the Tax Court should have directed the Commissioner to award refunds to the related corporations, or allowed it to assert the equitable defense of recoupment. We affirm the ap-

proval of the allocation of income and the refusal of the request for refunds and for equitable relief, but in light of the Supreme Court's intervening decision in *United States v. Foster Lumber Co.*, 429 U.S. 32, 97 S.Ct. 204, 50 L.Ed.2d 199 (1976), we reverse its determination that the net operating loss deductions were allowable.

## I. THE APPEAL

■ Section 172 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 172 (1967 & 1976 Supp.),[1] authorizes a taxpayer who sustains a net operating loss in a taxable year to carry that loss as a deduction to the preceding three and the succeeding five taxable years as an offset to taxable income realized in those years. It requires that the entire amount of the loss be carried to the earliest possible taxable year, and permits any portion of the loss not absorbed by taxable income in that taxable year to be carried forward to subsequent taxable years. It further provides that

> [t]he portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried.[2]

The parties have stipulated the facts to which we must apply this provision.

1. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954, 26 U.S.C.A. § 1 *et seq.* (1967 & Supp.1976).

2. 26 U.S.C.A. § 172(b)(2) (Supp.1976).

3. Continental's taxable years are denoted by the calendar years in which they end.

4. "REGULAR METHOD" (§ 11)

| | |
|---|---|
| Ordinary income | $382,097.08 |
| Net long-term capital gains | 269,298.04 |
| Subtotal | $651,395.12 |
| Less deductions other than net operating losses | 394.223.35 |
| Taxable income before deduction of net operating losses | $257,171.77 |
| Less net operating losses | 96,914.78 |
| Taxable income | $160,256.99 |
| Regular tax | $ 70,423.35 |

Continental experienced net operating losses of $67,511.31 and $29,403.47 in its 1964 and 1965 taxable years.[3] These losses, totalling $96,914.78, were available for carryover to 1966. In 1966 Continental realized $269,298.04 of net long-term capital gains, but when its gross ordinary income was reduced by all available deductions other than net operating losses, its ordinary income was negative. The deficit amounted to $12,126.27. Thus Continental's net operating losses were greater than its ordinary income but less than the sum of its ordinary income and its capital gains. Continental initially computed its income tax liability for 1966 under both the "regular method" specified by Section 11 and the "alternative method" specified by Section 1201.[4] Because the tax resulting from the use of the "regular method" exceeded that resulting from the use of the "alternative method," Continental was required to employ the latter. 26 U.S.C.A. § 1201 (1976 Supp.). Since Section 1201(a)(2) does not allow a taxpayer to deduct its net operating losses from its capital gains, *United States v. Foster Lumber Co.*, 429 U.S. at 37, 97 S.Ct. at 208, 50 L.Ed.2d at 205 (1976); *Chartier Real Estate Co. v. Commissioner of Internal Revenue*, 52 T.C. 346 (1969), *aff'd per curiam*, 428 F.2d 474 (1st Cir. 1970), Continental could not utilize the net operating losses it had accumulated during 1964

"ALTERNATIVE METHOD" (§ 1201)

| | |
|---|---|
| Net ordinary income | ($ 12,126.27) |
| Net long-term capital gains | 269,298.04 |
| Taxable income before net operating loss deduction | 257,171.77 |
| Less net operating losses | 96,914.78 |
| Taxable income | $160,256.99 |
| (Step 1 - Partial Tax) | |
| Less net long-term capital gains | 269,298.04 |
| Balance | ($109,041.05) |
| Partial tax on balance | .00 |
| (Step 2 - Capital Gains Tax) | |
| Plus 25 percent of net long-term capital gains | 67,324.51 |
| Alternative tax | $ 67,324.51 |

and 1965 to reduce its income tax liability for 1966. Believing that it was entitled to carry forward from its 1966 taxable year to subsequent taxable years the entire amount of those losses because it had not yet used them to reduce its actual tax liability, Continental took net operating loss deductions of $78,635.48 and $18,279.30 in its 1967 and 1969 taxable years, respectively. After auditing Continental's tax returns for 1967 and 1969, the Commissioner disallowed the deductions and issued a deficiency notice for both taxable years. When Continental challenged the deficiency assessment in the Tax Court, the issue was resolved in its favor. *Continental Equities, Inc. v. Commissioner of Internal Revenue*, 33 T.C.M. 812 (1974).

The Tax Court based its ruling that the net operating loss deductions were allowable solely upon the authority of its prior decision in *Chartier Real Estate Co. v. Commissioner of Internal Revenue, supra.* In *Chartier* it had held that where net operating losses exceed ordinary income net of all other deductions, but are less than the sum of ordinary income and capital gains, the amount by which the losses exceed ordinary income is available for carryover to subsequent taxable years. The foundation of *Chartier* is the Tax Court's creation of a special definition of "taxable income" designed solely for use in connection with Section 172(b)(2). According to *Chartier*, Section 172(b)(2) "taxable income" is "that taxable income to which the [net operating] loss is actually applied in computing actual tax liability." 52 T.C. at 358. Since net operating losses cannot be used to offset capital gains where the "alternative method" of computing income tax liability is employed, the *Chartier* interpretation excludes capital gains from "taxable income" for the purposes of Section 172(b)(2). This is at variance with the Section 63(a) general

definition of "taxable income"—"gross income, minus the deductions allowed by this chapter"—because under Section 61 "gross income" includes capital gains, *United States v. Foster Lumber Co.*, 429 U.S. at 36, 97 S.Ct. at 207, 50 L.Ed.2d at 203–204, and because Section 63(a) also provides that the meaning of the term "taxable income" shall be uniform throughout the Income Tax Subtitle (Sections 1 through 1564) of the Code.

In *United States v. Foster Lumber Co., supra*, the Supreme Court examined the interplay between Sections 63, 172, and 1201, and weighed the policy considerations supporting the Tax Court's construction of Section 172. It rejected the *Chartier* rule and concluded that Congress intended that the term "taxable income" as used in Section 172 include capital gains, just as it does everywhere else in the Code where no explicit modification of the Section 63(a) general definition exists. 429 U.S. 41, 97 S.Ct. at 210, 50 L.Ed.2d at 207. That decision controls the disposition of this case.

Since the amount of Continental's operating losses available for carryover to 1966 did not exceed its taxable income for that year, Continental was not entitled to carry any of those losses to subsequent taxable years. Therefore, the net operating loss deductions which it took in 1967 and 1969 must be disallowed. The decision of the Tax Court on this issue is reversed.

## II. THE CROSS–APPEAL

Pursuant to his authority under Section 482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 482 (1967),[5] The Commissioner determined that Continental had realized unreported interest income from loans it made to four related corporations during its 1968, 1969, and 1970 taxable years. The

---

5. Section 482 provides:

In any case of two or more organizations, trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross

income, deductions, credit, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

amounts and sources of this income were as follows:

| LENDEE | 1968 | 1969 | 1970 |
|---|---|---|---|
| Sunshine State Industrial Park, Inc. | $20,400.00 | $25,410.00 | $24,272.82 |
| Catamal Realty, Inc. | 7,980.00 | 7,549.98 | 4,689.96 |
| Sunshine State Flying Service | 150.00 | 150.00 | 150.00 |
| Western Research | .00 | .00 | .00 |
| TOTAL | $28,530.00 | $33,109.98 | $29,322.78 |

Continental's unqualified stipulation to these facts was filed with the Tax Court on April 9, 1974. One month later the Commissioner notified Continental that the interest expense correlative to the imputed interest income was deemed to have been allocated among the four related corporations as of March 18, 1974. When the Commissioner submitted his Rule 155 computation [6] of Continental's income tax liability based on the stipulation, Continental objected because it believed that the related corporations had not yet received refunds reflecting their shares of the income expense attributed to them. Continental argued that the statute and the applicable regulations required that such refunds be made before the interest income could be allocated to it. Assuming that they had not been made, Continental contended that the allocation was invalid. It also asserted that, in the event the allocation was sustained, Section 482 and the equitable doctrine of recoupment furnished independent grounds for compelling the Commissioner either to pay refunds to the related corporations, or to allow Continental to offset their overpayments against its current deficiency.

On December 18, 1974, the Tax Court held a hearing on Continental's objection. The transcript of the hearing indicates that all of the participants believed that the four related corporations had filed timely refund claims, and that these claims were being processed by the Internal Revenue Service in the usual manner. They were mistaken.

Only two of the related corporations ever filed refund claims for their 1968–1970 taxable years. One of them, Sunshine State Industrial Park, Inc., had already received a refund for its 1970 taxable year on September 25, 1972. The only other claimant, Catamal Realty, Inc., did not request a refund until April 2, 1975. Its claim was denied on July 10, 1975, on the grounds that it was untimely. At the conclusion of the hearing, the Tax Court adopted the Commissioner's Rule 155 computation. It ruled that all of the prerequisites to a Section 482 allocation had been satisfied, declined to order the Commissioner to grant refunds to the related corporations, and refused to consider the possibility that it had jurisdiction to award Continental equitable relief.

### A. The Refusal to Order Refunds for the Related Corporations

The Tax Court is a court of limited jurisdiction, possessing only such power to adjudicate controversies as is conferred upon it by the Internal Revenue Code. 26 U.S.C.A. § 7442 (1967); *Commissioner of Internal Revenue v. Gooch Milling & Elevator Co.,* 320 U.S. 418, 419–420, 64 S.Ct. 184, 185, 88 L.Ed. 139, 142 (1943); *Transport Manufacturing & Equipment Co. v. Commissioner of Internal Revenue,* 434 F.2d 373, 381 (5th Cir. 1970). It does not have the authority to order that a refund be given, or to review the Commissioner's denial of a refund claim. *United States ex rel. Girard Trust Co. v. Helvering,* 361 U.S.

---

**6.** Rule 155 of the Rules of Practice and Procedure of the United States Tax Court, 26 U.S.C.A. fol. § 7453 (Supp.1976), prescribes a procedure by which the Tax Court may determine the amount of tax liability resulting from its decision in cases in which it has not resolved all of the contested issues in favor of either party. If the parties disagree about the effect of the Tax Court's decision, the rule contemplates the filing of separate computations and requires that each party be given an opportunity to be heard.

540, 542, 57 S.Ct. 855, 856, 81 L.Ed. 1272, 1276 (1937); *Morse v. United States,* 494 F.2d 876, 879 (9th Cir. 1974); *Transport Manufacturing & Equipment Co. v. Commissioner of Internal Revenue,* 480 F.2d 448, 541 (8th Cir. 1973); L. Ponder, United States Tax Court Practice & Procedure 43 (1976). Therefore, we uphold the Tax Court's refusal to order the Commissioner to make refunds to the related corporations based on his Section 482 allocation, or to state that they are entitled to such refunds.

B. *The Approval of the Section 482 Allocation*

█ Continental's primary contention on this cross-appeal is that Section 482 and the pertinent treasury regulations make the payment of refunds to the related corporations a condition precedent to the allocation of interest income to Continental. We reject this view.

█ Section 482 authorizes the Commissioner to allocate "income, deductions, credits, or allowances" among commonly controlled enterprises where necessary (1) to prevent them from artificially shifting income and loss items among themselves to minimize their tax liability, or (2) to insure that the income of each related corporation is accurately reflected in its returns. *South Texas Rice Warehouse Co. v. Commissioner of Internal Revenue,* 366 F.2d 890, 898 n. 19 (5th Cir. 1966), *cert. denied,* 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 454 (1967). Its purpose is to place controlled taxpayers in the same position as uncontrolled taxpayers for both the current and subsequent taxable years. Treas.Reg. § 1.482–1(b)(1) (1976); *Commissioner of Internal Revenue v. First Security Bank of Utah,* 405 U.S. 394, 401, 92 S.Ct. 1085, 1089–91, 31 L.Ed.2d 318, 324–325 (1975); *Engineering Sales, Inc. v. United States,* 510 F.2d 565, 569 (5th Cir. 1975). Because Section 482 is an allocation provision rather than a recognition provision, it does not authorize the Commissioner to augment or diminish the income of a group of related corporations when taken as a whole. 7 J. Doheny, Merten's Law of Federal Income Taxation § 38.63, p. 159 (rev.

ed. 1976); B. Bittker & J. Eustice, Federal Income Taxation of Corporations & Shareholders, ¶ 15.06, p. 30, n. 53 (3d ed. 1971). Accordingly, the treasury regulations require that whenever the income of one member of a group of commonly controlled corporations is increased (primary adjustment) the income of at least one of the others must be decreased a commensurate amount (correlative adjustment). Treas. Reg. § 1.482–1(d)(2) (1976). They describe in detail how this is to be done.

> [T]he correlative adjustment shall actually be made if the U.S. income tax liability of the [related corporation] would be affected for any pending taxable year. . . . [A] "pending taxable year" is any taxable year with respect to which the U.S. income tax return of the [related corporation] has been filed by the time the allocation is made, and with respect to which a credit or refund is not barred by the operation of any law or rule of law. If a correlative adjustment is not actually made because it would have no effect on the U.S. income tax liability of the [related corporation] for any pending taxable year, such adjustment shall nevertheless be deemed to have been made for the purpose of determining the U.S. income tax liability of such [related corporation] for a later taxable year . . . . *Id.*

Under the regulations, the duty to make or deem made a correlative adjustment does not arise until one of five events has occurred. Treas.Reg. § 1.4821(d)(2)(i)–(v) (1976). Among these events, and controlling in this case because it happened first, is a stipulation by the parties that the reallocated income in question was properly imputed to the taxpayer.

█ As soon as the parties filed their stipulation in the Tax Court, the Commissioner became obligated either to make a correlative adjustment or to deem one to have been made. Although he did not discharge this duty immediately, he did act with reasonable promptness. Since the related corporations had neither filed refund claims nor submitted information sufficient

to enable him to determine whether a correlative adjustment would affect their income tax liability for a pending taxable year, the Commissioner elected to deem a correlative adjustment to have been made.

■ The Commissioner's decision was neither arbitrary nor inconsistent with the regulations. The regulations authorize him to make a primary adjustment whether or not the related corporations are, or ever will be, in a position to realize potential tax benefits which may result from a correlative adjustment. In *Fitzgerald Motor Co. v. Commissioner of Internal Revenue,* 508 F.2d 1096 (5th Cir. 1975), we reviewed a Section 482 allocation of interest income resulting from loans made among three sister corporations. There we held that the regulations issued to implement Section 482 authorized the Commissioner to merely deem a correlative adjustment to have been made because the allocation of interest expense to the related corporations would only have increased the amount of their net operating loss available for carryover, and would not have affected their tax liability for any pending taxable year. Today's case is distinguishable from *Fitzgerald* in only one respect. Here, the Commissioner concluded that the tax liability of the related corporations would not be affected for a reason different from that relied upon in *Fitzgerald:* In *Fitzgerald* there was no income which the interest expense could reduce; in this case the claims of the related corporations which could translate the correlative adjustment into a tax refund are time-barred by Section 6514(a).

This distinction does not command a difference in result. The tax liability of a related corporation is no more or less affected by a correlative adjustment if its refund claim is untimely, than if it sustained a net operating loss during the pertinent taxable year. If a related corporation's refund claim is barred because it is untimely, then the potential tax benefit is lost; if it sustained a net operating loss during the pending taxable year, then the potential tax benefit is deferred, and it may be extinguished if net operating losses continue in succeeding tax periods. Thus, where the tax liability of a related corporation would not be affected by a correlative adjustment, the regulations as construed by *Fitzgerald* permit the Commissioner to attribute the reciprocal of the primary adjustment to it by deeming a correlative adjustment to have been made. It is not a prerequisite to a primary adjustment that the related corporation be in a position to avail itself of any potential tax benefit which may result from a correlative adjustment.[7]

■ Nor do the regulations require the Commissioner to presume that a correlative adjustment will affect the tax liability of a related corporation for a pending taxable year. A taxpayer seeking a refund bears the burden of notifying the Commissioner that a refund is sought and of indicating the basis for the claim. *National Newark & Essex Bank v. United States,* 410 F.2d 789, 794, 187 Ct.Cl. 609, 618–619 (1969); *cf. Stoller v. United States,* 444 F.2d 1391, 1393 (5th Cir. 1971) (where a refund claim is filed, the Commissioner need examine only those points to which his attention is directed); *Alabama By-Products Corp. v. Patterson,* 258 F.2d 892, 900 (5th Cir. 1958), *cert. denied,* 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959); Treas.Reg. § 301.6402–2(b)(1) (1976). The regulations promulgated under Section 482 do not shift this burden to the Commissioner. *See* 2 J. Rabkin & M. Johnson, Federal Income, Gift & Estate Taxation § 11.02B(2), pp. 1119a–b (1976).

But Continental contends that Section 482 requires more than that the Commissioner comply with regulations. Its position is that the statute demands not only that a correlative adjustment actually be made, but also that a refund based on it be given before the primary adjustment can become final. Continental argues that if the regu-

---

7. We note that one of the related corporations in the instant case, Sunshine State Industrial Park, Inc., did collect a refund. The others could have avoided the extinguishment of their potential tax benefit had they either filed their claims within the period prescribed by Section 6511(a), or arranged to have the taxable years in issue kept open under Section 6511(c). Nothing the Commissioner did or failed to do caused the loss of the potential refund claims.

lations permit a primary adjustment to be made where the correlative adjustment is merely deemed to have been made and no refund is granted, they permit an invalid creation of income.

◼ A taxpayer challenging the validity of a treasury regulation faces a difficult task. Since Congress has expressly delegated rulemaking authority to the Secretary of the Treasury, 26 U.S.C.A. § 7805(a) (1967); *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528, 533 (1973), treasury regulations are valid legislative rules if they are "(a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." 1 K. Davis, Administrative Law Treatise § 5.03, p. 299 (1958) & § 29.01–1, p. 654 (Supp.1976); *Yellow Freight System, Inc. v. United States*, 538 F.2d 790, 796 (5th Cir. 1976). Since Continental does not assault the procedural foundation of the regulations, they "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Bingler v. Johnson*, 394 U.S. 741, 749–51, 89 S.Ct. 1439, 1444, 22 L.Ed.2d 695, 703–704 (1969), quoting *Commissioner of Internal Revenue v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948); *Fitzgerald Motor Co. v. Commissioner of Internal Revenue*, 508 F.2d at 1100; *see United States v. Cartwright, supra*; *United States v. Correll*, 389 U.S. 299, 306, 88 S.Ct. 445, 449, 19 L.Ed.2d 537, 543 (1967). Continental has not met this rigorous standard. The regulations allow the Commissioner to deem a correlative adjustment to have been made only where the Code does not authorize him to assess a deficiency against the related taxpayers, or to award them a refund or a tax credit. Thus the regulations operate to permit the Commissioner to make the adjustment necessary to prevent the artificial shifting of income among commonly controlled corporations resulting in tax avoid-

ance and, at the same time, to accomplish the other purposes of Section 482: to insure that the income of commonly controlled enterprises is accurately reflected in their returns, and to place commonly controlled corporations in the same position as uncontrolled taxpayers for subsequent taxable years. There is nothing unreasonable in this and, indeed, it is plainly consistent with the statute.

Moreover, acceptance of Continental's argument that the implementation of the correlative adjustment through refunds to the related corporations is a condition precedent to a primary adjustment, would generate absurd results at odds with the purposes of Section 482. It would make the Commissioner's ability to effect a Section 482 allocation dependent upon whether the related corporations could qualify for refunds. Under such a rule, commonly controlled corporations could shift income and loss items among themselves for tax avoidance purposes with impunity whenever a Section 482 allocation would not result in a refund to a related corporation, or whenever a related corporation that might be eligible for a refund neglected to file a timely claim. To adopt Continental's suggestion would be tantamount to judicial repeal of Section 482.

## C. *The Denial of Equitable Relief*

◼ Prior to the enactment of the Tax Reform Act of 1969 [8] the Tax Court did not possess equity jurisdiction. *Commissioner of Internal Revenue v. Gooch Milling & Elevator Co.*, 320 U.S. 418, 421–422, 64 S.Ct. 184, 186, 88 L.Ed. 139, 143 (1943); *Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 303, 67 S.Ct. 271, 274, 91 L.Ed. 296, 301 (1946); *Vandenberge v. Commissioner of Internal Revenue*, 147 F.2d 167, 168 (5th Cir.), *cert. denied*, 325 U.S. 875, 65 S.Ct. 1556, 89 L.Ed. 1993 (1945).[9] Continental contends that Subtitle D of the Act (Sec-

---

**8.** 83 Stat. 487 (1969).

**9.** Each of these cases specifically addressed the issue whether recoupment was within the Tax Court's jurisdiction and concluded that it was not. In both of the cases cited by Continental

in which recoupment was permitted, the offset was allowed by a district court or the Court of Claims. *See Bull v. United States*, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); *Stone v. White*, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed.

tions 951–962) changed this settled rule by granting the Tax Court jurisdiction over equitable claims. Since we disagree, we do not reach the question whether, assuming that the Tax Court did possess equity jurisdiction, Continental would be entitled to equitable relief.

In determining the Act's impact on the breadth of the Tax Court's jurisdiction, our first recourse must be to the statute itself. Although the Act increased the incidental powers of the Tax Court to include those previously given to the district courts,[10] transformed the Tax Court from an "independent agency in the Executive Branch"[11] into a "court of record [established] under article I of the Constitution of the United States," [12] and altered Subchapter C (the Tax Court provisions of the Code) in several other ways,[13] there is no evidence in the text of the Act that Congress meant to expand the Tax Court's jurisdiction to encompass equitable claims. We cannot believe that Congress would modify the powers of the Tax Court in such a significant way without mentioning what it was doing. Moreover, at least one provision of the Act strongly suggests that no major change in the Tax Court's jurisdiction was intended. Section 961 provides:

> The United States Tax Court established under the amendment made by section 951 *is a continuation of the Tax Court of the United States as it existed prior to the date of enactment of this Act,* the judges of the Tax Court of the United States immediately prior to the date of enactment of this Act shall become the judges of the United States Tax Court upon the enactment of this Act, and no loss of rights or powers, interruption of jurisdiction, or prejudice to matters pending in the Tax Court of the United States before the date of enactment of this Act shall result from the enactment of this Act. (Emphasis added.)

The small portion of the Act's legislative history that pertains to the amendments to Subtitle D corroborates our view. Since the Tax Court provisions originated in the Senate, the Senate Finance Committee's report on the measure is particularly significant. Nothing in the report indicates that any modification of the Tax Court's jurisdiction was contemplated *See* S.Rep. No. 91–552, 91st Cong., 1st Sess. (1969) *reprinted in* [1969] U.S. Code Cong. & Admin. News, pp. 2340–2344. Similarly, the Conference Committee Report indicates that the House managers of the bill did not believe Subtitle D would affect the Tax Court's jurisdiction. It states that "the act is to have no effect on existing litigation, jurisdiction, etc." Conf. Rep. No. 91–782, 91st Cong., 1st Sess. (1969) *reprinted in* [1969] U.S. Code Cong. & Admin. News pp. 2456–57, *supra.*

---

1265 (1937); *see also Boyle v. United States,* 355 F.2d 233 (3d Cir. 1965), *appeal after remand,* 380 F.2d 973 (3 Cir. 1967); *United States v. Bowcut,* 287 F.2d 654 (9th Cir. 1961).

10. Section 956 of the Act added the following subsection to 26 U.S.C.A. § 7456 (Supp.1976):
    (d) Incidental Powers—The Tax Court and each division thereof shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
    (1) misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
    (2) misbehavior of any of its officers in their official transactions; or
    (3) disobedience or resistance to its lawful writ, process, order, rule, decree, or command.
    It shall have such assistance in the carrying out of its lawful writ, process, order, rule, decree, or command as is available to a court of the United States.

11. 68A Stat. 879 (1954).

12. Section 951 of the Act amended 26 U.S.C.A. § 7441 to read:
    There is hereby established, under article I of the Constitution of the United States, a court of record to be known as the United States Tax Court. The members of the Tax Court shall be the chief judge and the judges of the Tax Court.
    *See Burns, Stix Friedman & Co. v. Commissioner of Internal Revenue,* 57 T.C. 392 (1971), 1971 CCH Tax Ct. Rep. ¶ 31,114, pp. 3679, 3681; *Stix Friedman & Co. v. Coyle,* 340 F.Supp. 4 (E.D.Mo.1972), *aff'd,* 467 F.2d 474 (8th Cir. 1972); C. Wright, Law of Federal Courts § 6, p. 13 & § 11, p. 37, (3d ed. 1976).

13. *See, e. g.,* §§ 952 & 957

It does not follow from the fact that the Tax Court is now an Article I "legislative court" that it possesses or was intended to possess the full judicial power, extending to "all cases, in law and equity," that is vested in "constitutional courts" created by Congress under Article III, which it had not possessed before. Congress has the authority outside of Article III to create specialized courts that do not have plenary judicial power, and it has often narrowly circumscribed the jurisdiction of the special tribunals it has created in the past. *See, e. g., O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) (Court of Military Appeals); *Williams v. United States,* 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933) (Court of Claims); *Ex Parte Bakelite Corp. v. United States,* 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929) (Court of Customs Appeals); *American Insurance Co. v. Canter,* 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828) (territorial courts). As the Supreme Court stated in *Ex Parte Bakelite Corp. v. United States:*

> While Article III of the Constitution declares, in section 1, that the judicial power of the United States shall be vested in one Supreme Court and in "such inferior courts as the Congress may from time to time ordain and establish," and prescribes in section 2, that this power shall extend to cases and controversies of certain enumerated classes, it long has been settled that Article III does not express the full authority of Congress to create courts and that other Articles invest Congress with powers in the exertion of which it may create inferior courts and clothe them with functions deemed essential or helpful in carrying those powers into execution. 279 U.S. at 449, 49 S.Ct. at 412, 73 L.Ed. at 793.

Nor does the circumstance that the Act decreased the dissimilarities between the Tax Court and the district courts [14] indicate that Congress intended to obliterate other dissimilarities which it did not explicitly address. Significant differences between the two types of court survived the passage of the Act.[15]

On the basis of this evidence, the conclusion that the 1969 Tax Reform Act did not grant the Tax Court equitable jurisdiction is inescapable. The courts that have addressed the issue are in agreement without conclusion that the Tax Court still does not possess jurisdiction over equitable claims. *Burns, Stix Friedman & Co. v. Commissioner of Internal Revenue,* 57 T.C. 392, 1971 CCH Tax Ct. Rep. ¶ 31,114, pp. 3679, 3681; *see Musso v. Commissioner of Internal Revenue,* 531 F.2d 772, 774 (5th Cir. 1976); *Morse v. United States,* 494 F.2d 876, 879 (9th Cir. 1974). So is the great weight of the secondary literature. L. Ponder, United States Tax Court Practice & Procedure pp. 19–20 (1976); Note, Procedural and Administrative Changes in the Tax Court created by the Tax Reform Act of 1969, 8 Hous.L.Rev. 395, 403 (1970); *see* 9 J. Doheny, Merten's Law of Federal Income Taxation § 50.07, pp. 21–22 (rev.ed. 1976); 5 J. Rabkin & M. Johnson, Federal Income, Gift & Estate Taxation (1976) §§ 72.02(1) & 76.06(5); Am.Jur.2d Federal Taxation 1977, ¶ 9303, p. 962; Goldfein & Saltzman, What the Tax Court's new status under the Reform Act means to practitioners, 32 J. Tax. 244, 246 (1970); Note, Recent Legislative Changes in the Constitutional Status of the United States Tax Court and the Courts of the District of Columbia, 1973 Wash. U. L. Q. 381, 382 n.63.

The Tax Court's rulings on the three issues raised in the cross-appeal are affirmed.

AFFIRMED IN PART AND REVERSED IN PART.

---

14. *See, e. g.,* §§ 953 & 956.

15. For example, the Tax Court has its own rules of practice and procedure, and its judges are appointed to fifteen-year terms rather than for life during good behavior.