DONNA S. PESCH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DAVID E. BRADSHAW, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16609–79, 16715–79.     Filed January 25, 1982.

---

*Lynne E. McNown* and *Larry D. Blust*, for the petitioner in docket No. 16609–79.

*Steven D. Lustig*, for the petitioner in docket No. 16715–79.

*Lawrence C. Letkewicz* and *Tommy F. Thompson*, for the respondent.

OPINION

DAWSON, *Judge*: Petitioners, formerly husband and wife, filed separate petitions disputing the following deficiencies determined by respondent in their Federal income taxes:

| Taxable year | Deficiency |
|---|---|
| 1969 ........................................ | $280 |
| 1971 ....................................... | 63,972 |

These cases were consolidated for purposes of trial, briefing, and opinion. Respondent has conceded the deficiency for 1969. Accordingly, the issues for decision, all of which affect only 1971, are as follows:

(1) Whether a refund made pursuant to the provisions of section 6411[1] but after 90 days from the date on which the application for a tentative carryback adjustment was filed is recoverable through the deficiency procedures or whether respondent's sole remedy is by suit to recover an erroneous refund.

(2) Whether the carryback of a net operating loss by an individual is absorbed by capital gain as well as ordinary income in a year in which the tax liability for the carryback year was computed under the alternative method prescribed by section 1201(b).

(3) In the absence of ordinary income, whether an individual is entitled to reduce the amount of capital gain by a net operating loss carryback for purposes of the second step of the computation of the alternative tax under section 1201(b).

(4) Whether a taxpayer can avoid liability for a deficiency in respect of a year for which he filed a joint return through the medium of an agreement to which respondent is not a party.

(5) Whether a taxpayer who files a joint return and computes his tax liability under the alternative method is liable for the entire deficiency determined for that year or only for the part thereof which is proportionate to his capital gain.

(6) Whether this Court has jurisdiction to relieve a taxpayer from liabiliity for a deficiency attributable to the disallowance of the carryback of another taxpayer's NOLs.

(7) Whether a quick refund for 1971 by reason of a carryback of an NOL from 1974, a year for which the period of limitation on assessment has been extended by agreement, serves to

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue.

extend the assessment period for 1971 when the deficiency for that year is not attributable to the carryback.

These cases were submitted fully stipulated pursuant to Rule 122.[2] The stipulation of facts and joint exhibits are incorporated herein by reference. The pertinent facts are summarized below.

### *Facts*

At the time that they filed their petitions with this Court, petitioner Donna S. Pesch (hereinafter referred to individually as Pesch) resided in Lake Forest, Ill., and petitioner David E. Bradshaw (hereinafter referred to individually as Bradshaw) resided in Glenview, Ill. During 1969 through 1974, the operative period in these cases, petitioners were married. On January 4, 1975, they were divorced.

Petitioners filed the following joint and separate Federal income tax returns[3] for the taxable years 1969 through 1974 on the indicated dates:

| | | | Separate | | | |
| | Joint | | Pesch | | Bradshaw | |
| Year | Original[1] | Amended | Original[1] | Amended | Original[1] | Amended |
| 1969 | 4/15/70 | --- | --- | --- | --- | --- |
| 1970 | 5/20/71 | --- | --- | --- | --- | --- |
| 1971 | 4/15/72 | 6/15/72 | --- | --- | --- | --- |
| 1972 | --- | --- | 6/22/73 | (²) | 7/18/73 | 1/2/75 |
| 1973 | --- | --- | 6/17/74 | (²) | 7/18/74 | 1/2/75 |
| 1974 | 7/21/75 | --- | --- | --- | --- | --- |

[1] All of the original returns were timely filed.
[2] The filing dates for Pesch's amended separate returns were not stipulated.

Petitioners' correct taxable income and correct tax liability for 1969, 1970, and 1971, before allowance of any net operating loss carrybacks or investment credit carrybacks, are as follows:

---

[2]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]The various returns were filed with either the Internal Revenue Service Center at Kansas City, Mo., or the District Director of Internal Revenue at Chicago, Ill.

| Year | Correct taxable income | Correct tax liability |
|------|------------------------|------------------------|
| 1969 | $991,472 | $550,613.00 |
| 1970 | 15,616 | [1] 3,605.20 |
| 1971 | 668,105 | 461,768.00 |

[1] In contrast to the other entries, the parties in their stipulation did not characterize this amount as "correct," but rather as "paid." It is not, however, in dispute.

Petitioners' correct tax liability for 1969, before allowance of any net operating loss carrybacks or investment credit carrybacks, is computed as follows:

|  | *1969* |
|--|--------|
| Alternative tax | $500,622 |
| Plus: Tax surcharge (10%) | 50,062 |
| Plus: Investment credit recapture | 17 |
| Total | 550,701 |
| Less: Investment credit | 88 |
| Correct tax liability before carrybacks | 550,613 |

Petitioners' alternative tax for 1969 is computed as follows:

(a) Correct taxable income ............................... $991,472
(b) Less: 50% of excess of net long-term capital gain over net short-term capital loss ........................ 1,001,243
(c) Balance ................................................. 0
(d) Excess of net long-term capital gain over net short-term capital loss ............................ 2,002,486

Step 1
(e) Tax (sec. 1) on (c) .................................... 0
Step 2
(f) 25% of (d) .............................................. 500,622
Alternative tax: (e) + (f) ...................................... 500,622

In 1972 and 1973, the years for which petitioners filed separate income tax returns, Bradshaw incurred net operating losses. Pesch, in contrast, did not incur (or ever claim to have incurred) an NOL for either of those years. In 1974, a year for which petitioners filed a joint return, they incurred an NOL. The correct net operating loss for each of these years is as follows:

| Year | Separate returns | | Joint return |
| | Pesch | Bradshaw | |
|------|-------|----------|--------------|
| 1972 | (¹) | $93,714 | --- |
| 1973 | (¹) | 258,944 | --- |
| 1974 | --- | --- | $236,614 |

¹ Pesch did not incur or ever claim to have incurred an NOL for this year.

For purposes of section 172(b)(2), petitioners' correct modified taxable income for 1969, 1970, and 1971 is computed as follows:

| | 1969 | 1970 | 1971 |
|------|------|------|------|
| Correct taxable income ............. | $991,472 | $15,616 | $668,105 |
| Plus: Modifications | | | |
| (a) Capital loss deduction ..................... | | 1,000 | --- |
| (b) Sec. 1202 deduction .......... | 1,001,243 | --- | 679,569 |
| (c) Deduction for exemptions ... | 2,400 | 2,500 | 2,700 |
| Correct modified taxable income | 1,995,115 | 19,116 | 1,350,374 |

Because of the NOLs sustained, several applications for tentative carryback adjustments (Forms 1045) were filed pursuant to section 6411(a). The first such application, dated December 25, 1973, was filed by Bradshaw in respect of his separate 1972 income tax return. The application was neither signed nor filed by Pesch. It requested quick refunds of $3,518 for 1970 and $50,033 for 1971.[4] No refund for 1969 was requested, however.

By letter dated February 20, 1974, respondent disallowed Bradshaw's application but advised him that he could file a "corrected application" or a formal claim (Form 843). The letter provided as follows:

> Your application listed above has been disallowed in full because of omissions and errors which we cannot readily correct within the time prescribed by law.
>
> Internal Revenue Regulations require that when there is a change in marital status and subsequently one of the parties sustains a loss, the loss may be carried back only to that portion of income reported on a previously filed joint return which is attributable to the person who sustained the loss.

[4]The quick refunds claimed for 1970 and 1971 were based on a claimed statutory loss of $161,917 and a net operating loss of $99,002 for 1972. As a result of an examination of his separate 1972 return, Bradshaw's statutory loss for that year was subsequently reduced to $156,629 and his NOL to $93,714.

Your 1969, 1970 and 1971 returns are not available for review at this time, but our records disclose that you filed a joint return with Donna Bradshaw for these years. If you and your wife each had income in these years it will be necessary to allocate your portion of income, deductions, exemptions and tax liability so that you can apply your 1972 loss to the income which is attributable to you. You should furnish a detailed schedule showing the allocation.

You may complete a corrected application or a claim, Form 843, and return it to this office. Please attach a copy of this letter.

By letter dated February 28, 1974, Bradshaw advised respondent that there had been no change in his marital status and, for that reason, the disallowance of his application was erroneous. The letter concluded by requesting that "you reconsider this position and advise us if this decision can be changed." Finally, by letter dated April 25, 1974, Bradshaw forwarded a "duplicate original" of his application. The cover letter provided as follows:

This is to confirm our conversation of Thursday, April 25, 1974, concerning the above-named taxpayer. As we discussed, I am enclosing a duplicate original of Form 1045 that you have been unable to locate. You will recall that the original Form 1045 was timely filed.

Also attached is the correspondence which I received from you dated February 20, 1974, together with a copy of my reply dated February 28, 1974. It is my understanding that you will now be able to process this application.

I appreciate your assistance and hope that we can expedite this matter. Please feel free to call me by telephone * * *

On May 20, 1974, respondent abated $3,518 in tax in petitioners' account for 1970. Part of this amount ($2,576) was transferred to Bradshaw's separate account for 1972 and applied as a credit against an outstanding liability. The balance ($942), together with interest, was refunded in the form of a check made payable jointly to petitioners, who both endorsed it.

On May 20, 1974, respondent also abated $50,033 in tax in petitioners' account for 1971. This amount, together with interest, was refunded in the form of a check made payable to petitioners, who both endorsed it.

The next application for a tentative carryback adjustment, dated December 31, 1974, was filed by Bradshaw in respect of his separate 1973 income tax return. The application was

neither signed nor filed by Pesch. It requested a quick refund of $170,177 for 1971.[5] On February 7, 1975, a refund in the amount requested, together with interest, was made in the form of a check made payable jointly to petitioners, who both endorsed it.

The final application for a tentative carryback adjustment, dated July 17, 1975, was filed by petitioners in respect of their joint 1974 income tax return. It requested a refund of $144,184 for 1971.[6] On September 26, 1975, a refund in the amount requested, together with interest, was made in the form of a check made payable jointly to petitioners, who both endorsed it.

Pursuant to section 6501(c)(4), Pesch and Bradshaw each individually entered into a series of agreements with respondent extending the statute of limitations on assessment for their 1972 and 1973 separate taxable years through December 31, 1979. Petitioners also entered into a series of agreements extending the statute of limitations on assessment for their 1974 taxable year through that same date. No agreements were entered into by either Pesch or Bradshaw for 1969, 1970, or 1971.

On September 7, 1979, respondent issued separate statutory notices to petitioners determining deficiencies in their income taxes for 1969 (subsequently conceded) and 1971. The deficiency for 1971 is attributable to the disallowance of the carryback of the 1972 NOL to 1971 and to the partial disallowance of the carryback of the 1973 NOL to 1971.[7] Respondent maintains

---

[5]The quick refund claimed for 1971 was based on a claimed statutory loss of $286,217, a net operating loss of $261,732, and an unused investment credit of $339 for 1973. As a result of an examination of his separate 1973 return, Bradshaw's statutory loss for that year was subsequently reduced to $284,823 and his NOL to $258,944.

[6]The quick refund claimed for 1971 was based on a claimed statutory loss of $638,688, a net operating loss of $236,614, and an unused investment credit of $677. Respondent has not challenged the correctness of any of these amounts.

[7]Pesch maintains that the statutory notice states that the deficiency for 1971 is solely attributable to the disallowance of the carryback of the 1972 NOL to 1971. Although the "Explanation of Items" page of the notice only expressly disallows the carryback of the 1972 NOL, the reason given for the disallowance (1972 NOL carryback fully absorbed in 1969) necessarily implies that part of the 1973 NOL carryback is also disallowed because it is partially absorbed in 1970. (Bradshaw originally carried the 1972 NOL back to 1970 and 1971.) Moreover, the 1973 NOL was slightly reduced as a result of the examination of Bradshaw's 1973 separate return. Both of these factors are clearly reflected in the supporting schedules attached to the statutory notice which painstakingly detail the

that the 1972, 1973, and 1974 net operating losses should be carried back and absorbed by modified taxable income, as follows:

| | 1969 | 1970 | 1971 |
|---|---|---|---|
| Modified taxable income | $1,995,115 | $19,116 | $1,350,374 |
| Carryback of NOLs | | | |
| 1972 ($93,714) | (93,714) | --- | --- |
| 1973 ($258,944) | --- | (19,116) | (239,828) |
| 1974 ($236,614) | --- | --- | (236,614) |
| Modified taxable income after carryback(s) | 1,901,401 | 0 | 873,932 |

Petitioners, on the other hand, maintain that the 1972, 1973, and 1974 net operating losses should be carried back and absorbed by modified taxable income as follows:

| | 1969 | 1970 | 1971 |
|---|---|---|---|
| Modified taxable income | $1,995,115 | $19,116 | $1,350,374 |
| Carryback of NOLs | | | |
| 1972 ($93,714) | (2,400) | (19,116) | (72,198) |
| 1973 ($258,944) | --- | --- | (258,944) |
| 1974 ($236,614) | --- | --- | (236,614) |
| Modified taxable income after carryback(s) | 1,992,715 | 0 | 782,618 |

One last matter—the disposition of the proceeds of the refund checks—deserves brief mention. As will be recalled, respondent issued a total of four refund checks in respect of Bradshaw's separate net operating losses for 1972 and 1973 and petitioners' NOL for 1974. All four checks were made payable jointly to petitioners, who both endorsed them. As will also be recalled, petitioners were divorced on January 4, 1975. On December 30, 1974, they entered into a settlement agreement providing, inter alia, for a lump-sum property settlement and for the disposition of property involved in a State-court action then pending between them. Pursuant to the terms of the settlement agreement, the proceeds of the refund checks were disposed of as follows:

*1972 NOL.*—Bradshaw's separate 1972 net operating loss generated two refund checks (for 1970 and 1971) dated May 22,

computation of the net operating losses for 1972, 1973, and 1974, and the NOL deductions for 1969, 1970, and 1971.

1974. Shortly after their receipt and endorsement by petitioners, these checks were used by Bradshaw to purchase five Treasury bills with an aggregate face amount of $55,000 which were held in a local bank.[8] Subsequently, and pursuant to the settlement agreement, the Treasury bills were delivered to Bradshaw, who received the proceeds.

*1973 NOL.*—Bradshaw's separate 1973 net operating loss generated a refund check (for 1971) dated February 7, 1975. Shortly after its receipt, Pesch endorsed this check which was then, pursuant to the settlement agreement, delivered to Bradshaw, who received the proceeds.

*1974 NOL.*—Petitioners' 1974 net operating loss generated a refund check (for 1971) dated September 26, 1975. This check (along with two others totaling $181.13 not relevant herein) was endorsed by petitioners and, pursuant to the settlement agreement, was exchanged at a local bank for two cashier's checks, one payable to the order of Pesch in the amount of $89,408.10 and the other payable to the order of Bradshaw in the amount of $62,051.67.[9]

## A. *Issues Pertaining to Both Pesch and Bradshaw*

### (1) *Applicability of Deficiency Procedures*

Bradshaw sustained a net operating loss for 1972. Accordingly, by application dated December 25, 1973, he filed for tentative carryback adjustments requesting quick refunds for 1970 and 1971. Acting under the erroneous impression that Bradshaw's marital status had changed, respondent disallowed the application in February 1974. By letter dated February 28, 1974, Bradshaw advised that his marital status had not changed and requested reconsideration. By letter dated April 25, 1974, he forwarded a "duplicate original" of his application with the understanding that it would be favorably processed. On May 20, 1974, respondent abated tax in petitioners' accounts for 1970 and 1971 in the respective amounts of $3,518 and $50,033. Part of the abatement for 1970 was

---

[8]The parties' stipulation does not specify in whose name(s) the Treasury bills were held. The tenor of the stipulation and the related exhibits suggest that they were held jointly. For example, both checks bear Pesch's restrictive endorsement "Pay to United of America Bank for a certificate of deposit or savings acc."

[9]The sum of the two cashier's checks ($151,459.77) includes the quick refund for 1971 ($144,184), interest paid thereon ($7,094.64), and the two miscellaneous checks ($181.13).

transferred to Bradshaw's separate account for 1972 and applied as a credit against an outstanding liability. The balance of that abatement and all of the abatement for 1971 were refunded in the form of two checks dated May 22, 1974.

Petitioners contend that the quick refund made by respondent in May 1974[10] cannot be recovered through the deficiency procedures because it did not give rise to a deficiency within the meaning of section 6211(a). Respondent, on the other hand, contends that the refund is recoverable as a deficiency in this proceeding.[11] We agree with respondent.

We begin our analysis with the statutory definition of a deficiency. In the case of income tax, section 6211(a) provides that—

the term "deficiency" means the amount by which the tax imposed by subtitle A * * * exceeds the excess of—

(1) the sum of

(A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus

(B) the amounts previously assessed (or collected without assessment) as a deficiency, over—

(2) the amount of rebates, as defined in subsection (b)(2), made.

Section 6211(b)(2) provides that the term "rebate" means "so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed by subtitle A * * * was less than the excess of the amount specified in subsection (a)(1) over the rebates previously made." See also sec. 301.6211–1(f), Proced. & Admin. Regs. Finally, section 301.6211–1(a), Proced. & Admin. Regs., provides that in the case of an amended return filed after the statutory due date, any amount shown as additional tax (other than amounts which the taxpayer is protesting rather than admitting) "shall be treated as an amount shown by the taxpayer 'upon his return' for purposes of computing the amount of a deficiency."[12]

---

[10]Although two refunds were made by respondent in May 1974, only the one for 1971 is involved herein. Accordingly, the singular form is used.

[11]Respondent also contends that Pesch is not entitled to raise this issue because she did not plead it in her petition. In the stipulation of facts, however, she expressly reserved the right to argue it on brief, and respondent did not object. Accordingly, we think the issue was thus tried by consent. See Rule 41(b)(1).

[12]On July 12, 1977, sec. 301.6211–1(a), Proced. & Admin. Regs., was amended by T.D. 7498, 1977–2 C.B. 473, to read as paraphrased and quoted above. See sec. 7805(b). Prior to

Next we analyze each of the elements of the statutory definition. Thus:

"[T]ax imposed:" In the notice of deficiency, respondent determined that petitioners' income tax liability for 1971 is $161,346. The fact that respondent resolved all issues in his favor in determining that liability is, of course, irrelevant for our present purpose. Accordingly, the tax imposed by subtitle A for 1971 is $161,346. See sec. 6211(a).

"[A]mount shown as the tax:" On their 1971 income tax return, petitioners reported a tax liability of $460,016. On an amended return for that year, they reported a tax liability of $461,768. There is nothing in the amended return to indicate that any part of this amount is protested. Rather, the amended return indicates that the reported liability is all admitted. See sec. 301.6211–1(a), Proced. & Admin. Regs. Accordingly, the amount shown as the tax by the taxpayers upon their return for 1971 is $461,768. See sec. 6211(a)(1)(A).

"[A]mounts previously assessed as a deficiency:" No amount was previously assessed (or collected without assessment) as a deficiency.[13] See sec. 6211(a)(1)(B).

"[R]ebates made:" Bradshaw filed applications for a tentative carryback adjustment of tax for 1971 in respect of net operating losses sustained in 1972 and 1973. In addition, petitioners filed an application for 1971 in respect of an NOL sustained in 1974. All three applications were granted and refunds made in the amounts requested "on the ground that the tax imposed by subtitle A * * * is less than the excess of (1) the amount shown as the tax by the taxpayer upon his return * * * over (2) the amount of rebates previously made." Sec. 301.6211–1(f), Proced. & Admin. Regs.; cf. *Groetzinger v. Commissioner*, 69 T.C. 309, 314–315 (1977). Accordingly, the amount of rebates made for 1971 totals $364,394 (see secs. 6211(a)(2) and 6211(b)(2)), determined as follows:

---

amendment, the regulation defined additional tax shown on an amended return as a deficiency within the meaning of sec. 6211(a).

[13]Prior to the amendment of sec. 301.6211–1(a), Proced. & Admin. Regs., the "amount previously assessed as a deficiency" would have been $461,768 less $460,016, or $1,752, and the "amount shown as the tax by the taxpayer upon his return" would have been $460,016. Because these two amounts are added together (see sec. 6211(a)(1)), the amendment of the regulation does not significantly alter our analysis from what it would otherwise have been.

| NOL year | Rebate made |
|---|---|
| 1972 | $50,033 |
| 1973 | 170,177 |
| 1974 | 144,184 |
| | 364,394 |

Applying now the statutory definition set forth in section 6211(a), we conclude that there is a "deficiency" in petitioners' income tax for 1971 in the amount of $63,972, determined as follows:

| | | |
|---|---|---|
| Tax imposed by subtitle A | | $161,346 |
| Less: Amount shown as the tax by the taxpayers upon their return | $461,768 | |
| Plus: Amount previously assessed as a deficiency ... | 0 | $461,768 |
| Less: Amount of rebates made | 364,394 | 97,374 |
| Deficiency | | 63,972 |

Petitioners seek to avoid this result by arguing, in effect, that the rebates made for 1971 total only $314,361, determined as follows:

| NOL year | Rebate made |
|---|---|
| 1972 | 0 |
| 1973 | $170,177 |
| 1974 | 144,184 |
| | [14] 314,361 |

---

[14]If petitioners were correct, the deficiency for 1971 would not be eliminated, but only reduced by $50,033, the amount of the quick refund for 1971. (This underscores the fact that the deficiency for that year is attributable to the disallowance of the carryback of the NOL from 1972 to 1971 *and* to the partial disallowance of the carryback of the NOL from 1973 to 1971.) Under these circumstances, the statutory definition would be applied as follows:

| | | |
|---|---|---|
| Tax imposed by subtitle A | | $161,346 |
| Less: Amount shown as the tax by the taxpayers upon their return | $461,768 | |
| Plus: Amounts previously assessed as a deficiency | 0 | $461,768 |
| Less: Amount of rebates made | 314,361 | 147,407 |
| Deficiency | | 13,939 |

According to petitioners, the quick refund made by respondent in May 1974 was erroneous within the meaning of section 6514(a)[15] because it was made more than 90 days after the date on which Bradshaw filed his application for a tentative carryback allowance.[16] They contend that under this circumstance, the exclusive remedy to recover an erroneous refund is an action brought by the United States under section 7405,[17] and that the period of limitation on such an action has expired.[18]

Under section 6411(a),[19] a taxpayer who incurs a net

---

[15]SEC. 6514. CREDITS OR REFUNDS AFTER PERIOD OF LIMITATION.

(a) Credits or Refunds After Period of Limitation.—A refund of any portion of an internal revenue tax shall be considered erroneous and a credit of any such portion shall be considered void—

(1) Expiration of period for filing claim.—If made after the expiration of the period of limitation for filing claim therefor, unless within such period claim was filed; or

(2) Disallowance of claim and expiration of period for filing suit.—In the case of a claim filed within the proper time and disallowed by the Secretary or his delegate, if the credit or refund was made after the expiration of the period of limitation for filing suit, unless within such period suit was begun by the taxpayer.

(3) Recovery of erroneous refunds.—

For procedure by the United States to recover erroneous refunds, see sections 6532(b) and 7405.

[16]The record is not clear concerning the exact date on which Bradshaw originally filed his application. Petitioners maintain, however, that it was timely filed and respondent does not challenge their assertion. Accordingly, we shall proceed on that basis.

The record is also not clear concerning the exact date on which respondent reversed himself and approved the application. Petitioners maintain that it was more than 90 days after the date on which Bradshaw originally filed his application. Although respondent contends to the contrary on the ground of burden of proof, we think that the relevant evidence tends to support petitioners.

[17]SEC. 7405. ACTION FOR RECOVERY OF ERRONEOUS REFUNDS.

(a) Refunds After Limitation Period.—Any portion of a tax imposed by this title, refund of which is erroneously made, within the meaning of section 6514, may be recovered by civil action brought in the name of the United States.

(b) Refunds Otherwise Erroneous.—Any portion of a tax imposed by this title which has been erroneously refunded (if such refund would not be considered as erroneous under section 6514) may be recovered by civil action brought in the name of the United States.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(d) Periods of Limitation.—

For periods of limitations on actions under this section, see section 6532(b).

[18]SEC. 6532. PERIODS OF LIMITATION ON SUITS.

(b) Suits by United States for Recovery of Erroneous Refunds.—Recovery of an erroneous refund by suit under section 7405 shall be allowed only if such suit is begun within 2 years after the making of such refund, except that such suit may be brought at any time within 5 years from the making of the refund if it appears that any part of the refund was induced by fraud or misrepresentation of a material fact.

[19]SEC. 6411. TENTATIVE CARRYBACK ADJUSTMENTS.

(a) Application for Adjustment.—A taxpayer may file an application for a tentative

operating loss may apply for a "quick refund" based on a tentative carryback adjustment of the taxes for the taxable years prior to the NOL year which are affected by the carryback of the NOL. See sec. 1.6411–1(a), Income Tax Regs. The application must contain specific information and must be filed within 12 months from the end of the year in which the NOL was sustained (but not before the return for that year has been filed). Sec. 6411(a); sec. 1.6411–1(b) and (c), Income Tax Regs. Although a refund is its objective, an application for a tentative carryback adjustment does not constitute a claim for credit or refund. Sec. 6411(a); sec. 1.6411–1(b)(2), Income Tax Regs. Accordingly, if the application is disallowed in whole or in part, no action may be commenced in any court for the recovery of any tax based thereon. Secs. 1.6411–1(b)(2) and 1.6411–3(c), Income Tax Regs.; *Crismon v. United States*, 550 F.2d 1205 (9th Cir. 1977), cert. denied 434 U.S. 807 (1977).

Under section 6411(b),[20] respondent is required within a 90-day period to undertake a limited examination of the application to discover omissions and errors of computation, determine the amount of the decrease in the tax occasioned by the carryback, and make the appropriate credit or refund. See sec.

---

carryback adjustment of the tax for the prior taxable year affected by a net operating loss carryback provided in section 172(b) * * * from any taxable year. The application shall be verified in the manner prescribed by section 6065 in the case of a return of such taxpayer, and shall be filed, on or after the date of filing of the return for the taxable year of the net operating loss * * * from which the carryback results and within a period of 12 months from the end of such taxable year * * * in the manner and form required by regulations prescribed by the Secretary or his delegate. * * *

\* \* \* \* \* \* \*

An application under this subsection shall not constitute a claim for credit or refund.

[20]SEC. 6411. TENTATIVE CARRYBACK ADJUSTMENTS.

(b) ALLOWANCE OF ADJUSTMENTS.—Within a period of 90 days from the date on which an application for a tentative carryback adjustment is filed under subsection (a), or from the last day of the month in which falls the last date prescribed by law (including any extension of time granted the taxpayer) for filing the return for the taxable year of the net operating loss * * * from which such carryback results, whichever is the later, the Secretary or his delegate shall make, to the extent he deems practicable in such period, a limited examination of the application, to discover omissions and errors of computation therein, and shall determine the amount of the decrease in the tax attributable to such carryback upon the basis of the application and the examination, except that the Secretary or his delegate may disallow, without further action, any application which he finds contains errors of computation which he deems cannot be corrected by him within such 90-day period or material omissions. Such decrease shall be applied against any unpaid amount of the tax decreased * * * and any remainder shall be credited against any unsatisfied amount of any tax for the taxable year immediately preceding the taxable year of the net operating loss * * * . Any remainder shall, within such 90-day period, be either credited against any tax or installment thereof then due from the taxpayer, or refunded to the taxpayer.

1.6411–3, Income Tax Regs. The 90-day period commences on the later of the date on which the application is filed, or the last day of the month in which falls the last date prescribed by law (including any extension) for filing the return for the year in which the NOL is sustained. Sec. 6411(b); sec. 1.6411–3(a), Income Tax Regs. In the present case, the later of those two dates is the date on which Bradshaw filed his application.

Neither section 6411 nor the regulations promulgated thereunder impose any sanction against respondent for his failure to act within the 90-day period.[21] See *Thrif-Tee, Inc. v. United States*, 492 F. Supp. 530, 534 (W.D. N.C. 1979), affd. per unpublished opinion 628 F.2d 1351 (4th Cir. 1980), cert. denied 449 U.S. 1124 (1981). We have previously held that we will not supply a sanction in the form of a bar against his determining a deficiency for the year in which the net operating loss was sustained. *Zarnow v. Commissioner*, 48 T.C. 213 (1967). Our rationale was expressed as follows:

> Section 6411 does not set forth the consequences of a failure by the respondent to act within the 90-day period on an application for a tentative carryback adjustment, but it seems clear to us that his failure to act during that time does not prevent him from later determining a deficiency for the year of the alleged loss. Section 6411 provides merely a tentative carryback adjustment; if the respondent allows an adjustment which he later determines was in error, he may subsequently correct such error. [Citations omitted.] *Since the respondent's actions within the 90-day period are not final, but merely tentative, we are unwilling to conclude that his failure to act should be conclusive.* There may be an omission in that the statute fails to provide any sanction for the respondent's failure to act within the 90-day period, but *we find no indication that the missing sanction is to be provided by holding that such a failure to act prevents him from determining a deficiency for the year of the alleged loss.* [*Zarnow v. Commissioner, supra* at 215. Emphasis added.]

Although *Zarnow* dealt with respondent's failure to act on an application within the statutorily prescribed 90-day period, we think its reasoning applies equally to the present cases where he acted after that period had expired.[22] Cf. *Blansett v.*

---

[21]By arguing that the quick refund made by respondent in May 1974 was erroneous within the meaning of sec. 6514(a), petitioners equate the 90-day period of sec. 6411 with a period of limitation. As will be discussed above, however, that is simply not the case.

[22]Respondent did act within the 90-day period by denying Bradshaw's application because of confusion concerning his marital status. At Bradshaw's request, however, respondent reconsidered his position and allowed the application, but only after the 90-day period had

*United States*, 283 F.2d 474, 479 (8th Cir. 1960); *Union Equity Cooperative Exchange v. Commissioner*, 58 T.C. 397, 416 (1972), affd. on another issue 481 F.2d 812 (10th Cir. 1973), cert. denied 414 U.S. 1028 (1973); *Collegiate Cap & Gown Co. v. Commissioner*, 59 T.C. 449, 454–455 (1972); *Hine v. Commissioner*, 54 T.C. 1552, 1560 (1970); *Thrif-Tee, Inc. v. United States*, 492 F. Supp. at 534, all of which emphasize the tentative nature of any adjustment made pursuant to section 6411.[23]

Our view is supported by the legislative history of section 6411. That section was originally enacted as section 3780, I.R.C. 1939, by section 4(a), Tax Adjustment Act of 1945 (Act of July 31, 1945), ch. 340, 59 Stat. 521–523. Anticipating the successful conclusion of World War II,[24] Congress designed the Tax Adjustment Act to facilitate reconversion and readjustment to peacetime production. H. Rept. 849, 79th Cong., 1st Sess. (1945), 1945 C.B. 566, 566–567, 569, 573–574, 580–583; S. Rept. 458, 79th Cong., 1st Sess. (1945), 1945 C.B. 592, 593–595. Congress was specifically concerned that reconversion might be impeded by shortages of cash and was troubled by the length of time it took under existing law for a taxpayer to obtain a refund from a carryback of a net operating loss. Accordingly, in order to encourage speedy reconversion and vigorous business expansion, the act provided for prompt payment of refunds attributable to carrybacks of NOLs. The statutorily prescribed 90-day period was thus designed "To speed up the operation of the carry-back refund procedure, so, that taxpayers may have the benefits of a currently improved cash position for reconversion." H. Rept. 849, *supra*, 1945 C.B. at 566, 569. Moreover, there is nothing in the legislative

---

expired. This spared Bradshaw the inconvenience of filing a claim for refund under sec. 6402 (see secs. 1.6411–1(b)(2) and 1.6411–3(c), Income Tax Regs.), and accelerated the receipt of his refund. Under these circumstances, we think petitioners are poorly positioned to even raise this issue. See the discussion of the legislative history of sec. 6411 which follows above.

[23]Petitioners analogize the 90-day period of sec. 6411(b) to the 90-day period of sec. 6213(a) for filing petitions with this Court, and argue that respondent should be penalized, just as a taxpayer is penalized, for his failure to act within the prescribed period. However, the analogy is not apt, if for no other reason than that petitioners overlook the *tentative* nature of adjustments made pursuant to sec. 6411. As we stated in *Collegiate Cap & Gown Co. v. Commissioner*, 59 T.C. at 454, "because the respondent's review of the application is limited, the allowance of an adjustment is tentative."

[24]At the time of the enactment of the Tax Adjustment Act of 1945, Germany had already surrendered (on May 7, 1945) and Japan was shortly to follow suit (on Sept. 2, 1945).

history of section 3780, I.R.C. 1939, to indicate that respondent cannot make a quick refund pursuant to a timely and otherwise proper application after the expiration of the 90-day period. See Rev. Rul. 78–369, 1978–2 C.B. 324. After all, failure to do so would appear to contravene the congressional policy in favor of the prompt payment of refunds attributable to carrybacks of net operating losses. See generally H. Rept. 849, *supra,* 1945 C.B. at 566. Finally, it should be noted that section 6411, as enacted by the Internal Revenue Code of 1954, contained no material change relevant herein from existing law. See H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. A412 (1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 582 (1954).

Our view is also supported by the cases and the regulations. Thus, we have previously held that respondent has available three remedies by which to recover refunds erroneously allowed pursuant to applications under section 6411. *Midland Mortgage Co. v. Commissioner,* 73 T.C. 902, 905–906 (1980); *Fine v. Commissioner,* 70 T.C. 684, 687–688 (1978); *Herman Bennett Co. v. Commissioner,* 65 T.C. 506, 510–511 (1975); *Neri v. Commissioner,* 54 T.C. 767, 770–771 (1970); *Polachek v. Commissioner,* 22 T.C. 858, 863–864 (1954). See sec. 301.6213–1(b)(2), Proced. & Admin. Regs. Accordingly, he may summarily assess a deficiency attributable to a tentative carryback adjustment as if due to a mathematical or clerical error appearing on the return. Sec. 6213(b)(2);[25] sec. 301.6213(b)(2)(i), Proced. & Admin. Regs.; *Blansett v. United States,* 283 F.2d 474 (8th Cir. 1960). In the alternative, a civil action may be brought in the name of the United States to recover the erroneous refund. Sec. 7405; sec. 301.6213–1(b)(2)(ii), Proced. & Admin. Regs.; see secs. 6514 and 6532(b). Finally, respondent

---

[25]SEC. 6213. RESTRICTIONS APPLICABLE TO DEFICIENCIES; PETITION TO TAX COURT.

(b) EXCEPTIONS TO RESTRICTIONS ON ASSESSMENT.—

    *        *        *        *        *        *        *

(2) ASSESSMENTS ARISING OUT OF TENTATIVE CARRYBACK ADJUSTMENTS.—If the Secretary or his delegate determines that the amount applied, credited, or refunded under section 6411 is in excess of the overassessment attributable to the carryback with respect to which such amount was applied, credited, or refunded, he may assess the amount of the excess as a deficiency as if it were due to a mathematical error appearing on the return.

Secs. 1206(a)(1) and 1206(d), Pub. L. 94–455, 90 Stat. 1703, 1704, redesignated par. 2 of sec. 6213(b) as par. 3 effective for returns filed after Dec. 31, 1976.

may issue a notice of deficiency under section 6212 and thereby subject the refund to the usual deficiency procedures, including review by this Court, prescribed by sections 6211 through 6215.[26] Sec. 301.6213–1(b)(2)(ii), Proced. & Admin. Regs.; *Krieger v. Commissioner*, 64 T.C. 214, 216 (1975). The selection of a particular remedy is within respondent's discretion (*Herman Bennett Co. v. Commissioner, supra* at 510–511), as none is exclusive (*Midland Mortgage Co. v. Commissioner, supra* at 906; *Fine v. Commissioner, supra* at 687–688; *Neri v. Commissioner, supra* at 771). Thus,

(ii) The method provided in [sec. 6213(b)(2)] to recover any amount applied, credited, or refunded in respect of an application for a tentative carryback adjustment which should not have been so applied, credited, or refunded is not an exclusive method. Two other methods are available to recover such amount: (*a*) By way of a deficiency notice under section 6212; or (*b*) by a suit to recover an erroneous refund under section 7405. *Any one or more of the three available methods may be used to recover any amount which was improperly applied, credited, or refunded in respect of an application for a tentative carryback adjustment.* [Sec. 301.6213–1(b)(2)(ii), Proced. & Admin. Regs. Emphasis added.]

See also H. Rept. 849, *supra*, 1945 C.B. at 583, which provides similarly but states that "It is contemplated that the Commissioner will usually proceed by way of a deficiency notice in the ordinary manner, and the taxpayer may litigate any disputed issues before the Tax Court." Finally, the legislative history of section 610, Revenue Act of 1928, ch. 852, 45 Stat. 875, clearly discloses that section 7405 was designed as a nonexclusive remedy for the recovery of erroneous refunds:

This section relates to the recovery of erroneous refunds as defined in section [6514] and also to refunds which are erroneous independently of section [6514]. The section provides that any erroneous refund, of either class, may be recovered by suit brought in the name of the United States if such suit is begun within two years after the making of the refund. *Obviously, if the limitation period on the making of assessments has not expired, the erroneous refund may be recovered by assessment in the ordinary manner.* [S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939–1 C.B. (Part 2) 409, 438. Emphasis added.]

---

[26]This remedy would not be available in those cases in which respondent had previously issued a statutory notice determining a deficiency for the same taxable year in respect of which a petition had been filed and a decision entered. Sec. 6212(c)(1); *Midland Mortgage Co. v. Commissioner*, 73 T.C. at 911–912.

Petitioners concede that respondent has several remedies by which to recover a quick refund but contend that those remedies are only available in cases in which the refund was made because of a "mistake of fact." If made because of a "mistake of law," they contend that respondent has no alternative but to proceed by way of a suit to recover an erroneous refund. Petitioners do not, however, cite any authority in support of this distinction.

We do not think petitioners' contention is either well conceived or supported by the cases. In *Neri v. Commissioner*, 54 T.C. 767 (1970), for example, the quick refunds were made for improper years, certainly a "mistake of law" under petitioners' classification. Nevertheless, we specifically rejected the taxpayers' contention that the erroneous refund procedure was exclusive. *Neri v. Commissioner, supra* at 771.

The only authority cited by petitioners in support of their general contention that respondent must proceed by way of a suit to recover an erroneous refund is *United States v. Young*, an unreported case (D. Del. 1979, 44 AFTR 2d 79–5780, 79–2 USTC par. 9609). That case, however, is inapposite. There, respondent summarily assessed the "100 percent penalty" under section 6672 against the taxpayer, who paid it in full. However, respondent mistakenly credited the payment to the taxpayer's proprietorship account[27] rather than his individual account. Because the proprietorship account was current, respondent subsequently refunded the payment to the taxpayer. Several years thereafter, the United States commenced an action against the taxpayer to recover the erroneous refund, relying on the 6-year period of limitation on collection after assessment.[28] The District Court held that the collection statute was inapplicable because the taxpayer had paid his liability in full. Rather, because respondent had erroneously refunded the payment, the 2-year period of limitation under section 6532(b) was applicable and served to bar the action.

*Young* is inapposite because it involves the 100-percent penalty, a liability (unlike a deficiency in income tax) which is

---

[27]Although the District Court's opinion does not make the matter clear, the taxpayer was apparently in business for himself as well as a "responsible officer" of a corporation. As a proprietor, he would, of course, be liable for employment taxes.

[28]See sec. 6502(a)(1).

not subject to the deficiency procedures prescribed by sections 6211 through 6215. *Medeiros v. Commissioner*, 77 T.C. 1255 (1981); *Wilt v. Commissioner*, 60 T.C. 977 (1973). *Young* is also inapposite because it involves a refund of a payment made to satisfy an outstanding liability which had been previously assessed. Here, however, the deficiency is in dispute and has not been assessed. Moreover, the refund here arose by virtue of a tentative carryback adjustment subject to respondent's further scrutiny. For these reasons, we do not understand how petitioners can find solace in *Young*.

In view of the foregoing, we hold that respondent may recover the quick refund made in May 1974 through the deficiency procedures and that his remedy is not limited to a suit to recover an erroneous refund.[29]

*(2) Absorption of 1972 NOL Carryback in 1969*[30]

In 1969, petitioners had net long-term capital gain of $2,002,486, taxable income of $991,472, and an ordinary income loss of $9,771.[31] Their tax liability for that year was computed under the "alternative method" prescribed by section 1201(b).[32]

---

[29]Because the deficiency procedures may be, and have been in fact, employed by respondent, sec. 6501, and not sec. 6532(b), defines the applicable period of limitation. *Krieger v. Commissioner*, 64 T.C. 214, 216 (1975). The statute of limitations is discussed, *infra*, in issue (7).

[30]In this section of the opinion, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year 1969. See sec. 172(e), as effective for the taxable years 1969 through 1974, which provides, in part, that "In determining the amount of any net operating loss carryback or carryover to any taxable year, the necessary computations involving any other taxable year shall be made under the law applicable to such other taxable year." See also sec. 1.172–1(e)(1), Income Tax Regs.

[31]The ordinary income loss ($9,771) represents the difference between net long-term capital gain reduced by the sec. 1202 deduction (i.e., $2,002,486 less $1,001,243, or $1,001,243) and taxable income ($991,472). Note that petitioners did not have any net short-term capital loss in 1969.

[32]SEC. 1201. ALTERNATIVE TAX.

(b) OTHER TAXPAYERS.—If for any taxable year the net long-term capital gain of any taxpayer (other than a corporation) exceeds the net short-term capital loss, then in lieu of the tax imposed by [section] 1 * * * , there is hereby imposed a tax (if such tax is less than the tax imposed by such [section]) which shall consist of the sum of—

(1) a partial tax computed on the taxable income reduced by an amount equal to 50 percent of such excess, at the rate and in the manner as if this subsection had not been enacted, and

(2) an amount equal to 25 percent of the excess of the net long-term capital gain over the net short-term capital loss.

The alternative method prescribed by sec. 1201(b) for noncorporate taxpayers was repealed by secs. 401(a) and 401(c), Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2866–2867, effective

In 1972, Bradshaw incurred a net operating loss which he carried back to 1969. The carryback, however, could not be utilized for that year because there was no ordinary income[33] for it to offset.[34] Accordingly, Bradshaw carried the NOL over to 1970 and 1971 where it could be fully utilized.

In the notice of deficiency, respondent determined that the carryback of the 1972 net operating loss was completely "absorbed" in 1969 by the net long-term capital gain for that year. Accordingly, he disallowed the carryovers to 1970 and 1971.[35] Petitioners, on the other hand, contend that the carryback was not absorbed in 1969[36] because no tax benefit was derived therefrom in that year.[37] In other words, they contend that a carryback is absorbed only by *ordinary income* in a year in which one's tax liability is computed under the alternative method. The issue, therefore, involves the "question of fit" between the tax benefits provided by section 1201 and section 172.

---

for taxable years beginning after Dec. 31, 1978. Cf. sec. 102, Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 186–187, which prescribes a 20-percent maximum rate on the excess of net long-term capital gain over net short-term capital loss for taxable years ending after June 9, 1981, and beginning before Jan. 1, 1982.

[33]For the sake of convenience, the term "ordinary income" will be used in this section of the opinion to mean taxable income reduced by 50 percent of the excess of net long-term capital gain over net short-term capital loss (in the case of an individual), and all of such excess (in the case of a corporation). Similarly, the term "capital gain," if not modified by "net long-term" or "net short-term," will be used to mean (in both cases) the excess of net long-term capital gain over net short-term capital loss.

[34]Compare the computation of the partial tax (sec. 1201(b)(1)), the first step in the computation of the alternative tax, with the computation of the tax in the second step (sec. 1201(b)(2)). Note that the first step only taxes ordinary income, whereas the second step only taxes capital gain. As discussed in the following section of this opinion, the carryback does not serve to reduce the capital gain for purposes of computing the tax in the second step. Note also that had petitioners computed their tax liability for 1969 under the generally less advantageous "regular method" prescribed by sec. 1, they would have been able to fully utilize the carryback for that year. However, their tax liability would still have been greater than under the alternative method.

[35]The disallowance of the carryover to 1970 did not give rise to a deficiency for that year because of the carryback of a net operating loss from 1973. The disallowance of the carryover to 1971 is primarily, but not exclusively, responsible for the deficiency for that year. In this regard, see note 7 *supra*, the accompanying text, and the two tables which follow immediately thereafter.

[36]Petitioners did allow $2,400 (the amount of the exemptions claimed on their 1969 return) of the carryback to be absorbed in 1969. See secs. 172(b)(2) and 172(d)(3).

[37]No tax benefit was derived from the carryback in 1969 because an NOL carryback does not serve to reduce capital gain for purposes of computing the tax in the second step of the alternative method. In this regard, see note 34 *supra*, as well as the following section of this opinion.

In *United States v. Foster Lumber Co.*, 429 U.S. 32 (1976), the Supreme Court was faced with the identical issue. The Court characterized this issue as follows:

The question is whether the two "tax benefit" provisions relied on by the [taxpayer]—low capital gain taxation under the alternative method and the loss carryback provision—must each be maximized independently of the other or whether Congress instead anticipated that the benefit provided by the loss deduction might on occasion be subsumed in the greater benefit provided by the alternative tax computation method. [*United States v. Foster Lumber Co., supra* at 40.]

The Court analyzed the literal language of section 172, reviewed its legislative history, and considered the congressional policy behind it. It then held that the carryback of a net operating loss is absorbed by capital gain as well as ordinary income even though the tax liability for the carryback year was computed under the alternative method. The fact that the net operating loss is therefore "wasted" through an accident of timing is unfortunate, but legally irrelevant.[38] *United States v. Foster Lumber Co., Inc., supra* at 46–48. See *Continental Equities, Inc. v. Commissioner*, 551 F.2d 74, 77–78 (5th Cir. 1977).

Petitioners attempt to distinguish *Foster Lumber Co.* on the basis that it involved a corporate taxpayer. They begin by noting that individuals, unlike corporations, are entitled to deduct from gross income 50 percent[39] of the excess of net long-term capital gain over net short-term capital loss. Sec. 1202. They then observe that an individual taxpayer who elects the alternative method foregoes the section 1202 deduction. Because such a taxpayer receives no benefit from that deduction under those circumstances, petitioners then contend that neither he nor she should suffer the detriment of having capital gain absorb the carryback of the net operating loss.

---

[38]For net operating losses sustained in taxable years ending after Dec. 31, 1975, a taxpayer can seek to minimize such accidents of timing by electing to forego the carryback period and, instead, carrying the loss forward. Sec. 172(b)(3)(E), as enacted by secs. 806(c) and 806(g)(1), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1598, 1605; redesignated as sec. 172(b)(3)(C) by sec. 703(p)(1)(B), Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2943. See sec. 7.0, Temporary Income Tax Regs.; Joint Comm. on Internal Revenue Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 1976–3 C.B. (Vol. 2) 1, 200–202.

[39]Effective for taxable years ending after Oct. 31, 1978, the applicable percentage was increased to 60. Secs. 402(a) and 402(c)(1), Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2867, 2868.

We think *Foster Lumber Co.* applies to individuals as well as corporations. In fact, as we will demonstrate shortly, the Supreme Court partially justified its holding in that case on the basis of consistency in the application of section 172 to corporate and individual taxpayers.

The technical issue in *Foster Lumber Co.*, as herein, involved the meaning of "taxable income" as the term is used in section 172(b)(2). That section governs the amount of carrybacks and carryovers that must be absorbed in any one taxable year before the excess can be carried to another taxable year. It provides as follows:

(2) AMOUNT OF CARRYBACKS AND CARRYOVERS.— * * * the entire amount of the net operating loss for any taxable year (hereinafter * * * the "loss year") shall be carried to the earliest of the taxable years to which * * * such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the *taxable income* for each of the prior taxable years to which such loss may be carried. For purposes of the preceding sentence, the *taxable income* for any such prior taxable year shall be computed—

(A) with the modifications specified in subsection (d) * * *

\* \* \* \* \* \* \*

and the *taxable income* so computed shall not be considered to be less than zero. * * *

[Emphasis added.]

Among the modifications specified in section 172(d) is the section 1202 deduction. Thus, section 172(d)(2)(B) provides as follows:

(d) MODIFICATIONS.—The modifications referred to in this section are as follows:

\* \* \* \* \* \* \*

(2) CAPITAL GAINS AND LOSSES OF TAXPAYERS OTHER THAN CORPORATIONS.—In the case of a taxpayer other than a corporation—

\* \* \* \* \* \* \*

(B) the deduction for long-term capital gains provided by section 1202 shall not be allowed.

There is absolutely nothing in the Supreme Court's discussion of "taxable income" as that term is used in section 172(b)(2) to even remotely suggest that it has one meaning for corporate taxpayers and another meaning for individual taxpayers. As the Court observed:

Section 172(d)(2)(B) provides a further indication that capital gains are properly included in the taxable income that a loss deduction must offset before being carried to a succeeding carryover year. For a noncorporate taxpayer who normally computes his tax liability by deducting 50% of net long-term capital gain under § 1202 of the Code, *§ 172(d)(2)(B) requires that the full amount of ordinary income plus capital gain be offset against the net operating loss.* That "taxable income" encompasses capital gain income for individual taxpayers under § 172 strongly suggests that the "taxable income" of corporate taxpayers should be given similar scope. [*United States v. Foster Lumber Co.*, 429 U.S. at 48 n. 18. Emphasis added.]

Moreover, we think the Supreme Court's analysis of the legislative history of, and congressional policy behind, section 172 and its conclusion that Congress did not intend a perfect fit between that section and section 1201 is equally applicable in the case of an individual taxpayer. The only difference is that the Court did not expressly consider the section 1202 deduction. That deduction is waived, however, whenever an individual elects the alternative method, *regardless of whether there is a carryback of a net operating loss.* See sec. 1201(b)(2). In other words, Congress has decided as a matter of policy that an individual taxpayer is not entitled to the benefit of both section 1202 and section 1201(b). Accordingly, an individual who elects the alternative method because it produces a lesser tax liability should not be entitled to "compensation" for the loss of the section 1202 deduction in the form of an artificial and strained construction of section 172(b)(2) which would read capital gain out of the definition of "taxable income." As the Supreme Court stated, "If Congress had intended to allow a loss deduction to offset only ordinary income when the alternative tax calculation method is used, it could easily have said so." *United States v. Foster Lumber Co.*, 429 U.S. at 41.

In view of the foregoing, we hold that the carryback of a net operating loss by an individual is absorbed by capital gain as well as ordinary income, even though the tax liability for the carryback year was computed under the alternative method.[40]

*(3) Computation of the Alternative Tax for 1969*[41]

---

[40]Cf. *Whitaker v. Commissioner,* T.C. Memo. 1977–238, in which we held that the carryback of an NOL by an individual is absorbed by both capital gain and ordinary income where the tax liability for the carryback year was computed under the regular method.

[41]See note 30 *supra,* which applies equally to this section of the opinion.

In the alternative, petitioners contend[42] that if the carry-back of the 1972 net operating loss is fully absorbed by capital gain in 1969, it should serve to reduce the amount of capital gain for purposes of the second step of the computation of the alternative tax under section 1201(b).[43] In other words, petitioners would compute their alternative tax for 1969 as follows:

(a) Taxable income ..................................... $991,472
(b) Less: 50% of excess of net long-term capital gain over net short-term capital loss .....................(1,001,243)
(c) Balance ............................................... 0
(d) Excess of net long-term capital gain over net short-term capital loss ........................... 2,002,486
(e) LESS: CARRYBACK OF 1972 NOL ............ (93,714)
(f) Balance .............................................. 1,908,772

Step 1:
(g) Tax (sec. 1) on (c) .................................. 0
Step 2:
(h) 25% of (f) ........................................... 477,193
Alternative tax: (g) + (h) ............................... 477,193

This computation of the alternative tax should be contrasted with the one set forth above under "Facts." Note that it results in an overpayment of approximately $25,000.

Petitioners' contention is understandably based on their desire to avoid the complete waste of the net operating loss for 1972. Unfortunately, however, we are unable to provide them with any relief.[44]

First, the literal language of the statute is quite clear. Section 1201(b)(2) defines a base equal to "the excess of the net

---

[42]Only Pesch has actually raised this issue. However, if it were resolved in her favor, Bradshaw would be equally benefited. Accordingly, we will treat it as having been jointly raised.

Also, petitioners appear to have abandoned this issue on brief. However, because they did not expressly concede it, we will decide it.

[43]See note 33 *supra*, for the meaning of "capital gain" and "ordinary income" as used in this section of the opinion.

See note 32 *supra*, for the text of sec. 1201(b).

[44]See note 38 *supra*, for subsequently enacted remedial legislation.

long-term capital gain over the net short-term capital loss" against which a flat percentage rate of tax is applied. "Net long-term capital gain" and "net short-term capital loss" are terms of art (see secs. 1222(7) and 1222(6)), whose meaning cannot be changed by judicial vagary. The excess of the former over the latter is nothing other than their arithmetic difference. There is simply no express provision for reducing this excess by the amount of a carryback of a net operating loss. Moreover, the legislative history[45] does not support any such reduction. Under these circumstances, we decline to "engraft such a limitation onto the plain words of the statute." *Chartier Real Estate Co. v. Commissioner*, 52 T.C. 346, 352 (1969), affd. per curiam 428 F.2d 474 (1st Cir. 1970).

Second, we have previously held that a corporation is not entitled to reduce the amount of capital gain by a net operating loss carryback for purposes of the second step of the computation of the alternative tax under section 1201(a).[46] *Chartier Real Estate Co. v. Commissioner*, 52 T.C. at 350–356; *Drew v. Commissioner*, T.C. Memo. 1972–40, slip op. at 37–39; cf. *Stevenson Co-Ply, Inc. v. Commissioner*, 76 T.C. 637, 643 n. 8 (1981); *Pope & Talbot, Inc. v. Commissioner*, 60 T.C. 74, 78–79 (1973), affd. per curiam 515 F.2d 155 (9th Cir. 1975); *KDI Navcor, Inc. v. Commissioner*, T.C. Memo. 1976–77. See *United States v. Foster Lumber Co.*, 429 U.S. 32, 38, 47–48 (1976); *Continental Equities, Inc. v. Commissioner*, 551 F.2d 74, 77–78 (5th Cir. 1977); cf. Rev. Rul. 56–247, 1956–1 C.B. 383, modified, Rev. Rul. 79–185, 1979–1 C.B. 222. In our view, the same rule should apply in the case of individuals who use the alternative method under section 1201(b) because there is no substantive difference between the two sections. Both sections prescribe an

---

[45]The legislative history of sec. 1201 and its predecessor, sec. 117(c), I.R.C. 1939, was exhaustively analyzed in *Chartier Real Estate Co. v. Commissioner*, 52 T.C. 346, 350–356 (1969), affd. per curiam 428 F.2d 474 (1st Cir. 1970), and in *Weil v. Commissioner*, 23 T.C. 424 (1954), affd. 229 F.2d 593 (6th Cir. 1956), and will not be repeated herein.

[46]SEC. 1201. ALTERNATIVE TAX.

(a) CORPORATION.—If for any taxable year the net long-term capital gain of any corporation exceeds the net short-term capital loss, then, in lieu of the tax imposed by [section] 11 * * * there is hereby imposed a tax (if such tax is less than the tax imposed by such [section]) which shall consist of the sum of—

(1) a partial tax computed on the taxable income reduced by the amount of such excess, at the rates and in the manner as if this subsection had not been enacted, and

(2) an amount equal to 25 percent of such excess * * *

alternative tax which is applicable if it results in a lesser liability than the regular tax imposed by section 11 (in the case of corporations) or section 1 (in the case of individuals). Moreover, both sections compute the alternative tax in the same two-step manner. Under the first step, ordinary income is computed at the regular rates applicable to corporations or individuals, as the case may be. Under the second step, a tax on capital gain is computed at a flat rate of 25 percent. The sum of these two taxes constitutes the alternative tax. Given this functional and structural identity, we see no reason to distinguish between section 1201(a) and section 1201(b) insofar as the manner in which an NOL carryback shall be treated.

Third, we have previously decided this exact issue under the Internal Revenue Code of 1939. Thus, in *Weil v. Commissioner*, 23 T.C. 424, 426 (1954), affd. 229 F.2d 593 (6th Cir. 1956), we held in a Court-reviewed opinion that "taxable capital gain is not to be reduced by the amount of unused deductions and credits in computing the alternative tax." Although *Weil* did not involve a net operating loss deduction, but rather an excess of current-year deductions and credits over ordinary income, we do not view this distinction as consequential.

*Weil* involved the alternative tax on individuals prescribed by section 117(c)(2), I.R.C. 1939, as effective for 1948,[47] the taxable year before the Court. Once again, however, that section and section 1201(b) are functionally and structurally identical. See sec. 29.117–3, Regs. 111; cf. *Chartier Real Estate Co. v. Commissioner*, 52 T.C. at 350–356; H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. A273 (1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 430 (1954); Rev. Rul. 56–247, 1956–1 C.B. 383, modified by Rev. Rul. 79–185, 1979–1 C.B. 222. Differences in

---

[47]SEC. 117. CAPITAL GAINS AND LOSSES. [I.R.C. 1939.]

(c) ALTERNATIVE TAXES.—

\*  \*  \*  \*  \*  \*  \*

(2) OTHER TAXPAYERS.—If for any taxable year the net long-term capital gain of any taxpayer (other than a corporation) exceeds the net short-term capital loss, there shall be levied, collected, and paid, in lieu of the tax imposed by sections 11 and 12 [the tax under the "regular" method], a tax determined as follows, if and only if such tax is less than the tax imposed by such sections:

(A) A partial tax shall first be computed upon the net income reduced by the amount of such excess, at the rates and in the same manner as if this subsection had not been enacted, and the total tax shall be the partial tax plus 50 per centum of such excess.

the literal language between the two sections exist only because of other differences (immaterial to the issue before us) between the Internal Revenue Code of 1939 and the Internal Revenue Code of 1954.[48]

For the reasons set forth above, we hold that an individual is not entitled to reduce the amount of capital gain by a net operating loss carryback for purposes of the second step of the computation of the alternative tax under section 1201(b).

## B. Issues Pertaining to Bradshaw

### (4) Effect of Petitioners' Settlement Agreement

Petitioners were divorced on January 4, 1975. On December 4, 1974, they entered into a settlement agreement. Bradshaw contends that, under the terms of this agreement, Pesch assumed sole responsibility for any deficiency for 1971 attributable to the carryback of his separate net operating losses to that year. Pesch, on the other hand, contends that the settlement agreement is not binding on respondent[49] and that its interpretation and implementation is not within this Court's jurisdiction for decision. Nevertheless, she argues in the alternative that under its terms, Bradshaw is the party solely liable for the deficiency.[50] Respondent, finally, contends that the settlement agreement, whatever its terms may provide, is simply irrelevant in defining petitioners' liability to him for the deficiency.

Respondent determined a deficiency for 1971, a year for which petitioners filed a joint return. Section 6013(d)(3) provides that "if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several."[51] See sec. 1.6013–

---

[48]For example, under the 1939 Code, "net income" is the base against which the applicable tax rate is applied. Sec. 21(a), I.R.C. 1939. Under the 1954 Code, however, "taxable income" is the base. Sec. 63(a). Moreover, the predecessor of the sec. 1202 deduction was only introduced into the 1939 Code in 1951. Sec. 117(b), I.R.C. 1939, as amended by sec. 322(a)(2), Revenue Act of 1951, ch. 521, 65 Stat. 499. Prior to that time, only a stipulated percentage of capital gain or loss was "taken into account" in computing net income.

[49]Oddly enough, Bradshaw agrees with this contention.

[50]Pesch makes this alternative argument in her reply brief. In her petition, however, she prays (again in the alternative) that we find Bradshaw primarily, and she only secondarily, liable for any deficiency that might ultimately be determined. This issue, if indeed it remains one, is adequately answered by the discussion which follows above.

[51]The privilege of filing a joint return has been so conditioned by statute since 1938. Sec.

4(b), Income Tax Regs. Joint and several liability extends not only to the tax reported on the return but also to any deficiency subsequently determined by respondent.[52] *Davenport v. Commissioner*, 48 T.C. 921, 926 (1967). Moreover, it is clear that a taxpayer cannot avoid such liability through the simple medium of an agreement to which respondent is not a party. See *Bruner v. Commissioner*, 39 T.C. 534, 537 (1962); *Neeman v. Commissioner*, 13 T.C. 397, 399 (1949), affd. per curiam 200 F.2d 560 (2d Cir. 1952), cert. denied 345 U.S. 956 (1953); *Casey v. Commissioner*, 12 T.C. 224, 227 (1949); *Bonner v. Commissioner*, T.C. Memo. 1979–435 (39 T.C.M. 403, 409, 48 P-H Memo T.C. par. 79,435, at 79–1707); *Ballenger v. Commissioner*, T.C. Memo. 1955–171; cf. sec. 7121. Accordingly, we hold that Bradshaw cannot shift liability for the deficiency to Pesch in this fashion.

### (5) Allocation of Deficiency

Bradshaw contends, apparently in the alternative to his preceding contention, that the liability for any deficiency for 1971 should be allocated between him and Pesch in proportion to their share of the excess of net long-term capital gain over net short-term capital loss for that year. He appears to advocate capital gain as the basis for his proposed allocation because petitioners used the alternative method to compute their tax liability for 1971.[53] Pesch, on the other hand, contends that Bradshaw is fully liable for any deficiency that the Court might determine. Respondent contends similarly.[54]

Once again, Bradshaw's effort to shift liability to Pesch must fail. Under section 6013(d)(3), joint and several liability is the price one must pay for the privilege of filing a joint return. *Sanders v. United States*, 509 F.2d 162, 165 (5th Cir. 1975). The

---

51(b), I.R.C. 1939; sec. 51(b), Revenue Act of 1938, ch. 289, 52 Stat. 476. See H. Rept. 1860, 75th Cong., 3d Sess. (1938), 1939–1 C.B. (Part 2) 728, 749. See also *Howell v. Commissioner*, 10 T.C. 859, 867–868 (1948), affd. per curiam 175 F.2d 240 (6th Cir. 1949), for a review of the cases applying the law prior to the Revenue Act of 1938.

[52]An exception to this rule is provided by sec. 6013(e) in the case of an "innocent spouse." See H. Rept. 91–1734, to accompany H.R. 19774 (Pub. L. 91–679) (1970); S. Rept. 91–1537 (1970), 1971–1 C.B. 606. That exception, however, is not applicable here.

[53]We are inclined to think Bradshaw also advocates capital gain as the basis for his proposed allocation because Pesch's share of the excess in question exceeds (or so he alleges) 91 percent.

[54]Respondent also contends that Bradshaw is not entitled to even raise this issue because he failed to plead it. Based on our review of the parties' stipulation of facts, however, we are satisfied that the issue was tried by consent. Rule 41(b)(1).

original forerunner of that section, sec. 51(b), Revenue Act of 1938, ch. 289, 52 Stat. 476, was enacted by Congress precisely in order to avoid the problem of allocating deficiencies between the incomes of the spouses. H. Rept. 1860, 75th Cong., 3d Sess. (1938), 1939–1 C.B. (Part 2) 728, 749. Cf. *Rabenold v. Commissioner*, 108 F.2d 639, 640 (2d Cir. 1940); *Crowe v. Commissioner*, 86 F.2d 796 (7th Cir. 1936); *Cole v. Commissioner*, 81 F.2d 485 (9th Cir. 1935), holding that under sec. 51(b) of the Revenue Act of 1932, ch. 209, 47 Stat. 188; sec. 51(b) of the Revenue Act of 1928, ch. 852, 45 Stat. 808, and sec. 223(b) of the Revenue Act of 1926, ch. 27, 44 Stat. 37, a deficiency must be allocated between the spouses "in spite of the practical administrative inconveniences."

Given the present statute, we decline to review Bradshaw's "authorities." Suffice it to say that we think they are all inapposite to the issue before us. Moreover, even if the law were other than it is, Bradshaw has failed to prove the factual predicate for his proposed allocation. Rule 142(a).

### C. Issues Pertaining to Pesch

#### (6) Equitable Relief

Pesch contends that she should not be held liable for a deficiency attributable to the disallowance of the carryback of Bradshaw's net operating losses for 1972 and 1973. In this regard, she reminds us that she and Bradshaw filed separate returns for 1972 and 1973 and that it was he who incurred the NOLs and carried them back. She also maintains that it was Bradshaw, not she, who received the proceeds of the two refund checks. She then argues that under these circumstances it would be "unfair" to hold her liable. However, she does not cite any authority in support of her position, nor does she deny (for purposes of this issue) that there is a deficiency within the meaning of section 6211(a).

Pesch's contention is essentially a plea for equitable relief. However, we have previously stated that—

this Court does not have the powers of a court of equity * * * ; it has only the powers which have been expressly conferred by the Congress. * * * To the extent that petitioner makes claim here for equitable relief, we are without authority to consider the matter. [*Lorain Avenue Clinic v. Commissioner*, 31 T.C. 141, 164 (1958).]

See also *Commissioner v. Gooch Co.*, 320 U.S. 418, 422 (1943)

("The Internal Revenue Code, not general equitable principles, is the mainspring of the [Tax Court's] jurisdiction"); *Hays Corp. v. Commissioner*, 40 T.C. 436, 443 (1963) ("The proper place for a consideration of petitioner's complaint is the halls of Congress, not here"), affd. 331 F.2d 422 (7th Cir. 1964), cert. denied 379 U.S. 842 (1964).

We think the foregoing adequately disposes of this issue. Nevertheless, we would like to briefly comment on Pesch's perception of the equities. The two refund checks in question were both made payable jointly to petitioners. Although the matter is not completely free from doubt, it would appear that the five Treasury bills which were purchased with the proceeds of the first such check were held jointly. Pesch subsequently relinquished her interest in these bills, as well as her interest in the proceeds of the second refund check. However, she did so pursuant to a negotiated settlement agreement. Accordingly, while Pesch may not have ultimately retained the proceeds of the refund checks, we are confident that she received a bargained-for equivalent. Under these circumstances, we do not think it is at all unfair to hold Pesch liable for the deficiency.

## (7) Statute of Limitations

Petitioners filed a joint return for 1971, the year presently before the Court. They also filed a joint return for 1974. However, they filed separate returns for 1972 and 1973.

Bradshaw incurred net operating losses for 1972 and 1973. Pursuant to his applications for tentative carryback adjustment, respondent refunded a total of $220,210 (i.e., $50,033 + $170,177) in tax for 1971 in the form of two checks, each made payable jointly to petitioners. Pesch, on the other hand, did not incur an NOL for either 1972 or 1973. However, she and Bradshaw sustained an NOL for 1974 in the amount of $236,614. Pursuant to their application for a tentative carryback adjustment, respondent refunded $144,184 in tax for 1971. This amount was refunded in the form of a check made payable jointly to them.[55]

---

[55]We do not think the manner in which petitioners divided the proceeds of this check is relevant to the present issue. Nevertheless, we note that Pesch received an amount significantly in excess of the deficiency determined by respondent.

Pesch and Bradshaw each executed a series of agreements (Forms 872) extending the statute of limitations on assessment for 1972 and 1973 through December 31, 1979. They similarly extended the statute of limitations for 1974 through that same date. They did not, however, execute any agreement for 1971.

On September 7, 1979, respondent issued separate notices of deficiency to petitioners for 1971. The deficiency for that year is attributable to the disallowance of the carryback of Bradshaw's NOL from 1972 to 1971 and to the partial disallowance of the carryback of his NOL from 1973 to 1971. The deficiency is not attributable to the carryback of petitioners' 1974 NOL to 1971. Neither the amount of that NOL nor the propriety of its carryback was ever challenged by respondent.

Respondent, of course, contends that assessment of the deficiency against Pesch is not barred by the statute of limitations. In support of his position, he relies on sections 6501(h) and 6501(m) and on the fact that agreements were executed for 1972, 1973, and 1974. Pesch, on the other hand, contends that assessment is time-barred because of the inapplicability of those sections. Rather, she relies on section 6501(a) and on the fact that no agreement was executed for 1971. For the reasons set forth below, we agree with respondent that assessment of the deficiency against Pesch is not barred by the statute of limitations.

Under the general rule of section 6501(a),[56] a deficiency must be assessed within 3 years from the date on which the return is filed. However, section 6501 is replete with exceptions to the general rule. Three such exceptions are relevant to the present issue. They are as follows:

SEC. 6501(c). EXCEPTIONS.—

\*     \*     \*     \*     \*     \*     \*

(4) EXTENSION BY AGREEMENT.—Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title \* \* \* , both the Secretary or his delegate and the taxpayer have consented in writing to its assessment after such time, the tax may be

---

[56]SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) \* \* \* , and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

\* \* \* \* \* \* \*

(h) NET OPERATING LOSS \* \* \* CARRYBACKS.—In the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback \* \* \* (including deficiencies which may be assessed pursuant to the provisions of section 6213(b)(2)), such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss \* \* \* which results in such carryback may be assessed. \* \* \*

\* \* \* \* \* \* \*

(m) TENTATIVE CARRYBACK ADJUSTMENT ASSESSMENT PERIOD.—In a case where an amount has been applied, credited, or refunded under section 6411 (relating to tentative carryback adjustments) by reason of a net operating loss carryback \* \* \* to a prior taxable year, the period described in subsection (a) of this section for assessing a deficiency for such prior taxable year shall be extended to include the period described in subsection (h) \* \* \* ; except that the amount which may be assessed solely by reason of this subsection shall not exceed the amount so applied, credited, or refunded under section 6411, reduced by any amount which may be assessed solely by reason of subsection (h) \* \* \*

The similarities and differences between sections 6501(h) and 6501(m) are thoroughly discussed in *Jones v. Commissioner*, 71 T.C. 391, 395–398 (1978). See also *Maxcy v. Commissioner*, 59 T.C. 716, 729–731 (1973). Suffice it to say here that both sections apply to deficiencies in respect of carryback adjustments. Moreover, both sections serve to extend the general 3-year period of limitation for an equal period of time. On the other hand, the sections differ "in the items upon which a deficiency that is assessed within the extended period may be based." *Jones v. Commissioner, supra* at 396.

Respondent relies primarily on section 6501(h). Paraphrasing that section, he argues that the deficiency for 1971 is attributable to the application to Pesch of the net operating loss carrybacks from 1972 and 1973, years for which the period of limitation was extended by agreement. Pesch counters, in part, by arguing that the 1972 and 1973 NOLs were Bradshaw's, not hers. She construes section 6501(h) to apply only in the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback *of the taxpayer*. Respondent challenges this construction, arguing that Pesch is reading into the statute language which is just not there.

As intriguing as the parties' arguments are, we decline to resolve this issue on the basis of section 6501(h).[57] Instead, we think section 6501(m) provides a firmer basis for our decision.

Section 6501(m) was enacted by section 3(a), Act of November 2, 1966, Pub. L. 89–721, 80 Stat. 1151, effective in any case in which the application under section 6411 was filed after the date of its enactment. The Senate Finance Committee report succinctly describes the manner in which the section is designed to operate:

the bill extends the period for assessing a deficiency when a quick refund has been made because of a carryback of * * * a net operating loss * * * even though the deficiency is not attributable to the carryback. Under this provision, a deficiency for a year, with respect to which a quick refund was made because of a tentative carryback, may be assessed at any time up to 3 years after the return is filed for the taxable year in which the carryback arose (provided this period is not further extended by other provisions of sec. 6501; i.e., where there was fraud involved, etc.). However, in such a case the deficiency assessment which may be made as the result of this provision cannot exceed the amount of the quick refund. (The deficiency assessment made as a result of this provision cannot exceed the amount of the original refund reduced by any deficiency attributable to the carryback.) [S. Rept. 1709, to accompany H.R. 11660 (Pub. L. 89–721), 89th Cong., 2d Sess. 4 (1966).]

In the present case, $144,184 was refunded under section 6411 by reason of petitioners' carryback of their 1974 NOL to 1971. Thus, under section 6501(m), the period for assessing a deficiency for 1971 was extended to include the period for assessing a deficiency for 1974, the year in which the carryback arose. Under section 6501(c)(4), the period for assessing a deficiency for 1974 was extended by agreement through December 31, 1979. Prior to that date, however, the notices of deficiency were issued. Accordingly, assessment of the deficiency for 1971 is not time-barred.

Several matters deserve special emphasis. First, section 6501(m) applies even though the deficiency is not attributable to the carryback.[58] Sec. 301.6501(m)–1(a)(2) (example), Proced. & Admin. Regs.; S. Rept. 1709, *supra* at 4; H. Rept. 2161, 89th

---

[57]We note, however, that this section unquestionably applies to Bradshaw, which is undoubtedly the reason why he did not assert any defense predicated on the statute of limitations.

[58]In contrast, sec. 6501(h) applies only if the deficiency is attributable to the carryback.

Cong., 2d Sess. (1966), 1966–2 C.B. 902, 905 (example); 112 Cong. Rec. 25,637 (1966). This is precisely the case here where the deficiency for 1971 is not attributable to the carryback from 1974.

Second, if the assessment period for the NOL year is extended by agreement, the assessment period for the deficiency year under section 6501(m) is also extended.[59] Thus, the Senate Finance Committee report states that—

a deficiency for a year, with respect to which a quick refund was made because of a tentative carryback, may be assessed at any time up to 3 years after the return is filed for the taxable year in which the carryback arose (provided this period is not *further extended by other provisions of sec. 6501 * * * ). [S. Rept. 1709, supra at 4. Emphasis added.]

The period may, of course, be "further extended" by agreement under section 6501(c)(4). *Neri v. Commissioner,* 54 T.C. 767, 771 (1970). Accordingly, by extending the assessment period for 1974, Pesch also extended the assessment period for 1971.

Third, the limitation on the amount of the deficiency which may be assessed under section 6501(m) does not apply here. The limitation is equal to the amount refunded under section 6411, reduced by any amount which may be assessed solely by reason of section 6501(h). Stated otherwise, "The deficiency assessment made as result of this provision cannot exceed the amount of the original refund reduced by any deficiency attributable to the carryback." S. Rept. 1709, *supra* at 4. Because the deficiency for 1971 is not attributable to the carryback from 1974, the limitation is equal to the amount of the refund, or $144,184. And because the deficiency is "only" $63,972, the limitation simply does not come into play.

Pesch advances only one argument against the applicability of section 6501(m). She maintains that because "no action was taken to assert a deficiency based on the 1974 NOL and its

---

*Jones v. Commissioner,* 71 T.C. 391, 398–399; *Maxcy v. Commissioner,* 59 T.C. 716, 729–730; see *Bouchey v. Commissioner,* 19 T.C. 1078 (1953); *Leuthesser v. Commissioner,* 18 T.C. 1112, 1123–1126 (1952).

[59]Pesch argues that the agreements which she executed only served to extend the period for assessing a deficiency for *1974.* However, she cites no authority in support of her position, which, in our opinion, is untenable. Although she may have intended only to extend the period for assessing a deficiency for 1974, that was not the legal consequence of her action under the plain language of secs. 6501(h) and 6501(m).

quick refund before December 31, 1979, the statute on the taxable year 1974 has run, and no deficiency based on the 1974 NOL and its quick refund can now be assessed." This argument, however, completely misses the mark.

The deficiency for 1971 is attributable to the disallowance of the carryback of the 1972 NOL to 1971 and to the partial disallowance of the carryback of the 1973 NOL to 1971. It is not attributable to the carryback of the 1974 NOL to 1971. As stated above, neither the amount of that NOL nor the propriety of its carryback was ever challenged by respondent. However, under section 6501(m) the deficiency year is "open" if the NOL year is open, *even though the deficiency is not attributable to the carryback of the NOL.* Sec. 301.6501(m)–1(a)(2)(example), Proced. & Admin. Regs.; S. Rept. 1709, *supra* at 4; H. Rept. 2161, *supra*, 1966–2 C.B. at 905 (example); 112 Cong. Rec. 25,637; see *Jones v. Commissioner*, 71 T.C. at 397; *Maxcy v. Commissioner*, 59 T.C. at 730. This is precisely the case here, for on the date on which the statutory notices were issued, September 7, 1979, the assessment period for 1974 had been extended by agreement through December 31, 1979.

Contrary to Pesch's suggestion, respondent is not required to plead exceptions to the general 3-year period of limitation in his notice of deficiency. Rather, in a case such as the present one, his obligation arises only on answer after the petitioner has specifically pleaded the 3-year statute as an affirmative defense. Rules 142(a), 39, and 34(b)(4); see *Groetzinger v. Commissioner*, 69 T.C. 309, 312 (1977).

Moreover, the fact that respondent failed to plead section 6501(m) in his original answer[60] is irrelevant. Respondent moved for, and the Court granted, leave to file an amendment to answer in which this specific exception was pleaded. Also under Rule 41(d) an amendment of a pleading generally relates back to the time of filing of the pleading.

Finally, the fact that section 6501(m) was only pleaded after December 31, 1979,[61] is similarly irrelevant. It is the timely

---

[60]In his original answer, respondent did obliquely plead sec. 6501(m), but only as applied to the carryback from 1972. We question, but need not decide, the applicability of that section to that carryback.

[61]Respondent filed his answer on Jan. 28, 1980, and his amendment to answer on May 4, 1981.

issuance of the notice of deficiency which serves to suspend the running of the period of limitation on assessment. Secs. 6503(a)(1), 6213(a), 6214(d), and 7481.

Accordingly, we hold that assessment of the deficiency for 1971 against Pesch is not barred by the statute of limitations.

At the request of two of the parties,

*Decisions will be entered under Rule 155.*